## Nash *v.* Atlantic White Tower System, Inc., Appellant.

Argued March 23, 1961.  Before Jones, C. J., Bell,
Musmanno, Jones, Cohen, Bok and Eagen, JJ.

*James F. Manley,* with him *Burns and Manley,* for appellant.

*Ralph S. Davis, Jr.,* with him *Evans, Ivory & Evans,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, May 2, 1961:

Mrs. Mary A. Nash stepped into a hole in the pavement in front of the White Tower Restaurant on Sixth Street, Pittsburgh, and fell, sustaining injuries. She and her husband, Granvel Nash, brought suit against the owner, Atlantic White Tower System, Inc., and recovered substantial verdicts. The defendant moved for judgment n.o.v. and for a new trial, which motions were refused by the court below.

The accident occurred on December 20, 1955. A representative of the insurance company covering defendant's liability, a J. C. Armstrong, discussed with Mrs. Nash the possibility of settlement and on May 25, 1956, submitted to her a release which specified the amount of $1364 as full settlement of the claims of both Mr. and Mrs. Nash. No check or money accompanied the blank release. Mr. and Mrs. Nash signed the release and mailed it to Armstrong.

On May 28, 1956, Mrs. Nash was examined by a Dr. Vates who found that her injured leg was not healing properly and that immediate further medical care was required. He placed her leg in a cast. The following day Mrs. Nash notified Armstrong of what had tran-

spired and informed him she could not settle with White Tower on the basis of the release of May 25th. Mr. Armstrong replied: "I am very sorry to hear that and I hope you progress nicely, and please keep in touch with me. Let me know how you get along."

A few days later Mrs. Nash received a check from the insurance company in the amount of $1364 but she returned it with the following letter: "I am returning the check as per our phone conversation today regarding my leg being put in a plaster cast."

In July or August of that year Armstrong called Mrs. Nash to ask how she was progressing and she informed him that she probably would need surgery. He replied: "You let me know if anything like that develops."

Mrs. Nash was required to undergo hospitalization and she advised Mr. Armstrong to that effect. While in the hospital she was notified by Armstrong that he was being transferred to another city and he sent her forms for her doctors to fill out. In January, 1957, a Mr. Rizzo, Armstrong's successor, called at her home, to inquire as to her health, since she had now been discharged from the hospital. Still later she had to reenter the hospital and she acquainted Rizzo with that fact. In the early summer of 1957 when she was again at home, Rizzo called to ascertain the condition of her health and to inquire if she had by now received all her medical bills. There were other visits unnecessary to record here. In August she tendered to Rizzo the bills covering the medical and hospital care she had received.

Eventually she and Rizzo discussed a final settlement and she stated a sum which he regarded as reasonable. He submitted the offer to his company. All these calls, visits and inquiries reached an anticlimax in September, 1957, however, when Rizzo notified Mrs. Nash that his company refused to pay the sum she

requested and that it would stand on the release of May 25, 1956. Mr. and Mrs. Nash now entered suit against White Tower and won verdicts in the sum of $7,000 for Mr. Nash and $18,000 for Mrs. Nash.

In its appeal from the action of the court below, the appellant contends that the release signed by the Nashes precludes them from claiming a larger sum than the amount specified in the release. At the trial the court charged the jury that if the negotiations between the Nashes on one side and Armstrong and Rizzo on the other resulted in a rescission of the release of May 25, 1956, the Nashes were not bound by its provisions. At the defendant's request the court submitted to the jury two interrogations on the subject. They were replied to as follows:

"1. Did Mr. and Mrs. Nash intend to settle their claims against the defendant when they signed the Release of May 25, 1956, and mailed it back to Mr. Armstrong?

X (Yes)
(No)

"2. Did the defendant by its representatives, Mr. Armstrong and Mr. Rizzo, after June or July 1956, by their activities acquiesce in rescinding the prior settlement of May 25, 1956?

X (Yes)
(No)"

In spite of this factual determination of the issue, submitted by the defendant itself, it still insists that the release bound the plaintiff irrevocably. This presupposes the proposition that when two persons contract with one another to do or not to do a certain thing, they may never again mutually agree to change their minds. This is a strange doctrine. A contract is not like the laws of Medes and Persians, reputed to be eternally unalterable.

What can be done under the law can be undone by law when all persons involved agree on the necessary procedure. A contract is not to be regarded as a Kamikaze plane in which the parties seal themselves for mutual destruction. When they both decide to change their minds, they unlock the seal and re-negotiate as to their future intra-party relationship.

As to the right of the Nashes and the insurance company to mutually agree on a change in their contract of May 25, 1956, there can be no question. In the case of *Himeles v. Rose,* 84 Pa. Superior Ct. 363, 365, the Court said: "It is a settled law that it may be shown by parol that a written contract was subsequently modified or abandoned, and this may also be shown by the conduct and acts of the parties: 1 Beach on Contracts 943. The law is thus stated in Holloway v. Frick, 149 Pa. 178: 'It is always competent for the parties to a written contract to show that it was subsequently abandoned in whole or in part, modified, changed, or a new one substituted, and this may be shown by parol, by showing either an express agreement, or actions necessarily involving the alteration'. . . . The mutual unexecuted undertakings of an existing contract are a sufficient consideration for the cancellation of such contract and the substitution of a new one with different terms."

Then the appellant argues: "The question of whether or not Mr. Nash ever received the agreed-upon consideration should not have been introduced in this case. The Release on its face stated that the money was 'in hand paid by White Tower Management Corp., the receipt whereof is hereby acknowledged.' "

But the money was not "in hand paid" to Mr. or Mrs. Nash. While, of course it is understood that in business dealings certain assumptions contrary to literal fact are accepted in order to avoid unnecessary delays in final dispositions, it cannot be insisted here

that "in hand paid" must be read as an established reality when the facts in the case reveal that even before the money was transmitted by the insurance company it had agreed that the situation had changed and a reappraisement of the facts was impelling.

From May 28, 1956, until September, 1957, the representatives of the insurance company watched over Mrs. Nash with the solicitude of a doctor tending a feverish infant. Personal calls, telephone inquiries, and correspondence all attested to the insurance company's finger on the monetary pulse of the situation so that it could be ready on a moment's notice to make a final settlement satisfactory to itself. If it had intended to stand on the May 25, 1956 agreement, there would have been no necessity for Armstrong and Rizzo to figuratively wear out the carpet to Mrs. Nash's bedside to study periodically with financial stethoscope the medical bills accruing after May 25, 1956.

As further answer to the contention of the appellant that Mrs. Nash had cut off all escape from the release since the release said that $1364 had been "to me in hand paid," it is to be noted that the insurance company itself looked upon those words as elegant fiction because, with the release, it sent a letter stating that when the release would be signed by the Nashes and returned to the insurance company, "we *will* forward you a draft in the above amount." (Emphasis supplied.) It is obvious from the future tense of the verb employed in the letter, that the insurance company itself recognized that the agreement of March 25, 1960, did not definitively resolve and finalize the mutual obligations of each party to the other. At most, the agreement was an executory contract of accord without satisfaction.

In *Konqueror v. Kinney Co.*, 315 Pa. 318, the plaintiff sued the defendant to recover $3,000 which the defendant had offered to pay for the cancellation of a

lease, the payment to be made within 72 hours of acceptance. The offer was accepted by the plaintiff and arrangements made to complete the transaction the following day. At the time indicated the defendant receded from the contract and refused to pay the $3,000. This Court held that he had the right to so recede: "Payment and acceptance of the sum agreed upon were essential to termination of the lease. This is not a case where a promise to perform is a satisfaction of the agreement, as in Laughead v. Frick Coal Co., 209 Pa. 368, and Meaker Galv. Co. v. McInnes & Co., 272 Pa. 561, consequently those cases do not rule the present controversy. 'Until satisfaction, an accord is revocable at the pleasure of either party. An unexecuted accord is not enforceable by action; and, inasmuch as there is no satisfaction of the original obligation, it remains in force and the creditor has his remedy by action to enforce it': 1 C.J. 533, section 23."

The appellant contends also that the plaintiffs failed to establish any negligence on the part of the defendant restaurant owner. Mrs. Nash testified that her heel caught in a hole in the sidewalk which she described as being an irregular triangle in shape 10 to 12 inches wide at the base, extending 8 inches to an apex, and about 2 inches deep. Her daughter, Mrs. Alice Hurd, testified she examined the sidewalk five days later after the accident and she generally confirmed the description of the hole as given by her mother. The appellant complains that the court was in error in allowing this testimony. It was for the jury to determine if the sidewalk seen five days following the accident represented the same condition as was present on the day of the accident. The record established that the jury was justified in concluding that the condition of the concrete pavement had not altered within the five days indicated.*

---

* *Kmiotek v. Anast*, 355 Pa. 349.

Finally, the appellant complains that the plaintiff failed to show that the defendant had had actual or constructive notice of the defect in the sidewalk. Mrs. Nash described the appearance of the hole as follows: ". . . it was very dirty, had a lot of dirt in it, old black dirt and cigarette butts and matches. It was an old hole, I would say."

We are satisfied that from; this evidence that the jury could fairly conclude that the defect in the pavement had existed for a sufficient period of time to acquaint the owner with its existence.

Judgment affirmed.

Mr. Justice Bell would reverse and enter judgment n.o.v.