CLARENCE JOHNSON AND GLODEAN JOHNSON, HUSBAND AND WIFE, APPELLANTS, v. JOE UTILE AND ANN M. UTILE, HUSBAND AND WIFE, RESPONDENTS.

No. 6079

July 13, 1970

472 P.2d 335

---

[5] 10785 N.C.L., 1929, and NRS 171.206 are found to be comparable statutes.

*Gary A. Sheerin,* of Carson City, for Appellants.

*Diehl, Recanzone & Evans,* of Fallon, for Respondents.

**OPINION**

By the Court, MOWBRAY, J.:

This is a contract case arising from the sale of a 160-acre parcel of real property in Lyon County. The dispute centers about three wells located on the property.

1. *The Facts.*

In February 1967, Clarence Johnson and his wife, Glodean, who are the appellants, agreed to sell their property to Joe and Ann M. Utile, who are the respondents. The parties signed a "Deposit Receipt and Agreement of Sale," which provided in pertinent part:

". . . Seller agrees to drill 16 inch well, same area, same depth as existing irrigation well. Well to be tested, minimum 24 hours, at between 1,000 and 1,200 GPM [gallons per minute]. Seller agrees to drill and test well on or before close of escrow."

In 1 month to the day, on March 3, 1967, the parties signed their escrow instructions, which provided in pertinent part:

"(6) Sellers herein to drill and test a new well prior to close of escrow. Well to be 16 inches and in the same area and at the same depth as the existing well."

Approximately 1 month later, the Johnsons orally informed the Utiles that the existing well on the property, which had been drilled and used for some time (and which we shall designate as Well No. 1), was no longer operative and that, therefore, it was not to be considered included in the sale of the premises. The Utiles then consulted their attorney and resolved the matter by having him write the Johnsons a letter dated May 12, 1967, which provided in pertinent part:

". . . [Y]our suggestion to leave your test pump and a gasoline-powered motor on the new well [Well No. 2] *for and in consideration of* the Utiles relinquishing any claim on the existing well [Well No. 1] would be satisfactory, *provided that* the equipment is in satisfactory operating condition, and, further, assuming that the new well has been tested and is capable of producing the amount of gallonage set out in the agreements referred to herein, and, of course, that the pump and motor

are capable of pumping the water in the desired amounts consistent with the gallonage rating of the well itself. . . ." (Emphasis added.)

This arrangement appeared to satisfy the parties, and Mr. Johnson, who is a licensed well driller, proceeded to drill Well No. 2. He drilled the well to a depth of 105 feet and testified that it produced, over a 24-hour period, from 1,000 to 1,200 gallons of water per minute. The Utiles took possession of the property in June. They claim that the well never produced more than 300 gallons of water per minute and that in September 1967 the well went dry. Thereafter, the Utiles drilled a third well (Well No. 3), which apparently is operative and satisfactory for all ostensible purposes.

The Utiles then commenced this action in the district court, seeking damages for (1) the loss of Well No. 1, (2) expenses incurred in attempting to repair Well No. 2 and for drilling Well No. 3, (3) seed loss due to water shortage, and (4) attorney's fees and costs. The district judge found in favor of the Utiles and awarded them damages as follows: (1) $3,200 for the loss of Well No. 1; (2) $419.15 for expenses incurred in attempting to make Well No. 2 operative; (3) $3,060 for the cost of Well No. 3; (4) $636 for seed loss; and (5) $1,500 for attorney's fees and costs. We affirm the judgment of the lower court and the damages awarded therein.

2. *The Compromise Agreement.*

A. *Executory accord or substituted contract.*

The principal issue in this case will be resolved by our interpretation of counsel's letter to the Johnsons of May 12, 1967, supra; i.e.: Was the proposed compromise agreement, which the Johnsons accepted, an executory accord or a substituted contract?

A compromise agreement is a contract whereby the parties, in an effort to resolve their differences over a claim, agree to an amicable settlement based upon mutual concessions. Compromise agreements are usually divided into two principal categories: One may be called an "executory accord"; the other may be called a "substituted contract." If the compromise provides for the acceptance in the future of a stated performance in satisfaction of the claim, the contract is an "executory accord."[1] If, on the other hand, the compromise agreement itself is accepted as a substitution for and extinguishment of the existing claim, then the compromise is a

---

[1] Restatement of Contracts § 417 (1932); 6 A. Corbin, Contracts § 1269 (1962).

substituted contract.[2] Or, to state it another way, an agreement that operates as a satisfaction of an antecedent claim only when performed is an executory accord, and an agreement that operates as an immediate substitution for and extinguishment of an antecedent claim is a substituted contract.

The distinction becomes vital in relation to the remedies available to the nonbreaching party if and when the compromise agreement is broken. If an executory accord is breached, the nonbreaching party may sue either upon the original obligation or upon the compromise agreement. As stated in Restatement of Contracts § 417(c) (1932):

"If the debtor breaks such a contract the creditor has alternative rights. He can enforce either the original duty or the subsequent contract."

This is the prevailing view throughout the American jurisdictions. See Owens v. Hunter, 368 P.2d 753 (Ariz. 1962); Silvers v. Grossman, 192 P. 534 (Cal. 1920); Hinkle v. Basic Chem. Corp., 431 P.2d 14 (Colo. 1967); Wilson v. Bogert, 347 P.2d 341 (Idaho 1959); Daly v. Chicago & N.W. Ry. Co., 114 N.W.2d 682 (Minn. 1962); Ladd v. General Ins. Co., 387 P.2d 572 (Ore. 1963); Nash v. Atlantic White Tower System, Inc., 170 A.2d 341 (Pa. 1961); Stratton v. West States Constr., 440 P.2d 117 (Utah 1968); Annot., 94 A.L.R.2d 504 (1964); 6 A. Corbin, Contracts § 1275 (1962).

B. *The intent.*

The determination of whether the compromise agreement is an executory accord or a substituted contract turns on the intent of the parties to it. As stated by Corbin, supra, § 1293, at 190:

"It is frequently difficult to determine whether a new agreement is a substituted contract operating as an immediate discharge, or is an accord executory, the performance of which it is agreed shall operate as a future discharge. It is wholly a question of intention to be determined by the usual processes of interpretation, implication or contruction." (Footnotes omitted.)

In the instant case, the record shows that counsel's letter of May 12 and the Johnsons' acceptance by their subsequent

---

[2]Restatement of Contracts § 418 (1932); 6 A. Corbin, Contracts § 1269 (1962).

conduct constituted an executory accord. Admittedly, the language of the Deposit Receipt and Agreement of Sale and the escrow instructions lacks clarity. Because of the ambiguity in the written documents, the district judge heard and considered the oral testimony of the parties, and he concluded as a result thereof that their initial agreement included not only an operating well (Well No. 1), but also the drilling of Well No. 2. A fair reading of counsel's May 12 letter supports the court's conclusion that the letter referred to an antecedent obligation, where the proposed compromise stated that the Utiles agreed to relinquish their claim to operating Well No. 1, *"provided that* the equipment [on Well No. 1] is in satisfactory operating condition, and, further, assuming that the new well [Well No. 2] has been tested and is capable of producing the amount of gallonage set out in the agreements. . . ." (Emphasis added.) Such language supports the district judge's decision, in that the Utiles agreed to relinquish their right to Well No. 1 only after Well No. 2 had been drilled and had produced and operated satisfactorily.

C.  *The breach.*

The Utiles may recover damages for the loss of Well No. 1 only if the record supports the district judge's finding that the Johnsons breached the parties' compromise agreement by failing to produce Well No. 2, in that it was not "capable of producing the amount of gallonage set out in the agreements. . . ."

Appellants argue on this point that their only duty with respect to Well No. 2 was to produce a well on the property that would *test* between 1,000 and 1,200 gallons of water per minute. Mr. Johnson testified that he conducted such a test, with satisfactory results. The Utiles, however, produced evidence that the well production never exceeded 300 gallons per minute and that in a comparatively short period of time it went dry. While there is a conflict in the record, there is sufficient evidence to support the district judge's finding that the parties bargained for something more than a mere test and truly intended that the well to be drilled, Well No. 2, should be capable of producing the specified gallonage over a reasonable period of time, if the well were to be of any value to the purchasers. This court may not disturb the finding of the lower court where there is evidence in the record to support it. See Kellar v. District Court, 86 Nev. 445, 470 P.2d 434 (1970); Utley v. Airoso, 86 Nev. 116, 464 P.2d 778 (1970); Havas v. Alger, 85 Nev. 627, 461 P.2d 857 (1969); Richfield

Oil Corp. v. Harbor Ins. Co., 85 Nev. 185, 452 P.2d 462 (1969).

3. *The Damages.*

This court has reiterated on several occasions the well recognized rule that one who breaches a duty to another is liable for all damages naturally flowing from the wrongful breach. See Fuller v. United Elec. Co., 70 Nev. 448, 273 P.2d 136 (1954); Mackay v. Western Union Tel. Co., 16 Nev. 222 (1881). See also Unruh v. Smith, 267 P.2d 52 (Cal.App. 1954); 11 S. Williston, Contracts § 1344 (3d ed. 1968); 5 A. Corbin, Contracts §§ 997–998 (1964).

Since we have ruled in the instant case that the compromise agreement of the parties was an executory accord, which was breached by the appellants, it follows that the plaintiffs-respondents were entitled to damages for the loss of Well No. 1, their expenses incurred in attempting to make Well No. 2 operative, the drilling of Well No. 3 to replace Well No. 2, and their seed loss due to lack of water, as well as their attorney's fees and costs. The record supports the damages awarded by the district judge, and we may not disturb the award on appeal.

The judgment is affirmed.

COLLINS, C. J., ZENOFF, BATJER, and THOMPSON, JJ., concur.