John F. KAPPEL and Edna I. Kappel, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Sarah Kappel COURTLEY et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. 66–946 to 66–948 and 66–1026 to 66–1028.

United States District Court, W. D. Pennsylvania.

Jan. 9, 1974.

Robert C. MacAlister, John A. Metz, Jr., M. J. Arnd, Frank E. Coho, Pittsburgh, Pa., for plaintiffs.

Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., Jerome Fink, Tax Division, Dept. of Justice, Washington, D. C., for defendant.

## OPINION

### FINDINGS OF JURISDICTIONAL FACTS

WEBER, District Judge.

1. These six consolidated actions are suits for the recovery of overpayment of individual Federal Income Taxes for the years 1954, 1955, 1957 and 1958.

2. Plaintiffs John F. Kappel and Edna I. Kappel resided in Wexford, Pennsylvania; Plaintiffs Sarah Kappel and William D. Kappel resided in Ben Avon Heights, Pennsylvania, at the time the complaints were filed.

Plaintiff William J. Kappel died January 20, 1967, and Sarah M. Kappel and William D. Kappel were named and duly

qualified as co-executors of his estate. Following the death of William J. Kappel, Sarah M. Kappel remarried one Clarence Courtley. Plaintiffs Edna I. and Sarah M. Kappel were plaintiffs to these actions only by virtue of having filed joint federal income tax returns with their husbands for each of the years in suit. Reference to plaintiffs hereinafter will refer only to husband plaintiffs.

3. John F. Kappel filed timely federal income tax returns, on the cash receipts and disbursement method of accounting, with the District Director of Internal Revenue at Pittsburgh, Pennsylvania, showing taxable income as follows:

| | |
|---|---|
| 1954 — | $96,998.12 |
| 1957 — | 76,656.04 |
| 1958 — | 97,783.28 |

4. William J. Kappel filed timely federal income tax returns, on the cash receipts and disbursement method of accounting, with the District Director of Internal Revenue at Pittsburgh, Pennsylvania, showing taxable income as follows:

| | |
|---|---|
| 1955 — | $189,653.71 |
| 1957 — | 202,865.53 |
| 1958 — | 289,400.26 |

5. Thereafter, the income tax returns filed by the plaintiffs were audited by the Internal Revenue Service and as a result of said audit deficiencies of tax, penalties and interest were assessed against John F. Kappel in the amount of $60,473.03, and against William J. Kappel in the amount of $219,659.20.

6. The above deficiency assessments arose from a determination by the Internal Revenue Service that certain items should be included in gross income of the plaintiffs for the years in question and certain other items should not be allowed as deductions in the years in question.

7. The plaintiffs paid the above deficiency assessments in full.

8. Plaintiffs' timely claims for refunds were denied by the Internal Revenue Service and the present actions were timely filed.

9. Venue is proper and jurisdiction exists pursuant to 28 U.S.C. § 1346(a)(1).

These six cases involve common issues of fact and law arising out of the federal income tax returns of:

John F. Kappel for the years 1954, 1957, and 1958.

William J. Kappel for the years 1955, 1957, and 1958.

The eight issues which are involved in these cases have been described as follows and are involved in the returns of the taxpayer indicated for the years indicated.

## ISSUE NO. 1

Was the cash surrender value of the annuity policies on the lives of the plaintiffs, but owned by the corporate pension trust, income to the plaintiffs upon the surrender of the policies?

John F. Kappel for the years 1954, 1957 and 1958;

William J. Kappel for the years 1955 and 1957.

The parties have agreed upon this issue pursuant to the prior decision of this court in Kappel v. United States, 281 F.Supp. 426 [W.D.Pa.1968], aff'd, 437 F.2d 1222 [3rd Cir. 1971], cert. den., 404 U.S. 830, 92 S.Ct. 71, 30 L.Ed. 2d 59 [1971], and the proceeds of these annuities represent income to the plaintiffs.

## ISSUE NO. 2

Were the plaintiffs entitled to a reduction from the total amounts received from the cash surrender value of the annuities by reason of contributions to the costs of the annuities from plaintiffs' own personal funds?

John F. Kappel for the years 1954 and 1958;

William J. Kappel for the years 1955 and 1957.

## ISSUE NO. 3

Whether the plaintiffs are entitled to deductions in the amounts claimed for travel and entertainment expenses.

John K. Kappel for the years 1954, 1957 and 1958;

William J. Kappel for the years 1955, 1957 and 1958.

## ISSUE NO. 4

Whether distributions received by plaintiffs from various corporations represent taxable dividends in part or nontaxable return of capital.

John F. Kappel for the years 1957 and 1958;

William J. Kappel for the years 1957 and 1958.

This matter has been resolved by stipulation of the parties that the distributions represent return of capital in whole or in part and the appropriate reduction from plaintiffs' income will be computed by the defendant.

## ISSUE NO. 5

Was a negligence penalty under Sec. 6653(a) of the Internal Revenue Code properly applied to the deficiencies at issue?

John F. Kappel for the years 1954, 1957, and 1958;

William J. Kappel for the years 1955, 1957, and 1958.

## ISSUE NO. 6

Should the cash surrender value of certain annuity policies be included in income for 1955 or 1954?

William J. Kappel only for the year 1955.

## ISSUE NO. 7

Whether the cash surrender value of certain annuities owned by William J. Kappel personally should be included in his income for 1955, and should the amount be reduced by payments allegedly made by him?

William J. Kappel for the year 1955.

The United States has conceded that only the excess of the proceeds ($36,020.50) over the cost to him ($25,645) in the amount of $10,375.50 represents ordinary income to him for the year 1955, and the tax due will be so computed.

## ISSUE NO. 8

Was the cash surrender value of Dominion policy No. 232608 in the amount of $12,209.63 income to John F. Kappel in 1957 or 1958?

John F. Kappel for the year 1958.

This leaves Issues Nos. 2, 3, 5, 6 and 8 to be determined by the court. In accordance with Par. 79 of the Stipulation it was agreed that if plaintiffs are entitled to recovery, in whole or in part, the exact amount of the refund will be ascertained by recomputation of the Internal Revenue Service agreed to by the parties, or, in the case of inability to agree, by the court.

This court will discuss its findings and conclusions on issues numbered 3 and 5 first, because the remaining issues all contain a common element of constructive receipt.

## ISSUE NO. III

Entertainment and travel expense deduction.

| | Year | Claimed | Disallowed |
|---|---|---|---|
| John F. Kappel | 1954 | $3,000.00 | $ 500.00 |
| John F. Kappel | 1957 | 3,000.00 | 1,500.00 |
| John F. Kappel | 1958 | 3,000.00 | 1,500.00 |
| William J. Kappel | 1955 | $6,500.00 | $1,980.00 |
| William J. Kappel | 1957 | 6,500.00 | 3,250.00 |
| William J. Kappel | 1958 | 6,500.00 | 3,250.00 |

The disallowed amounts were made because of a complete lack of documentation or other proof of the amount and nature of the expenses paid other than estimates claimed by plaintiffs.

This was before the 1962 Amendment to the Internal Revenue Service where Section 274 requires adequate substantiating records. The prior rule of Cohan v. Commissioner of Internal Revenue, 39 F.2d 540 [2nd Cir. 1930], only required an approximation as close as possible to the actual expenditures.

■ The testimony here by the widow of William J. Kappel to the effect that he conducted his Florida winter home as a general meeting place for company personnel during the season, and as to the number and extent of the business visitors, and her estimate of the amounts expended for this purpose well supports the taxpayer's claim under the pre-1962 Cohan rule.

■ John F. Kappel's more modest claim for travel and entertainment when visiting company stores in Pittsburgh, Chicago, New York and Birmingham, Alabama, with three trips to New York, three trips to Chicago, and one to Birmingham each, where bankers, lawyers, salesmen and employees were entertained appears entirely reasonable for the head of a widespread chain of credit jewelry stores. We find the amount fair and reasonable, and as close an approximation as possible.

## ISSUE NO. V

A negligence penalty under Sec. 6653(a) of the Internal Revenue Code has been assessed against each of the taxpayers for the years indicated for failure to report additional income or unallowable deductions as follows:

*John F. Kappel for the year 1954:*

| | |
|---|---|
| a) Annuity Income (Issue No. 1) | $50,001.86 |
| b) Travel and Entertainment Expense (Issue No. 3) | 500.00 |
| c) Capital Gain (not an issue here) | 923.73 |

*John F. Kappel for the year 1958:*

| | |
|---|---|
| a) Annuity Income (Issue No. 1) | $132,836.26 |
| b) Travel and Entertainment Expense (Issue No. 3) | 1,500.00 |
| c) Dividends vs. Capital (Issue No. 4) | 1,600.00 |
| (Issue No. 4 has been resolved in favor of the taxpayer). | |

*William J. Kappel for the year 1955:*

| | |
|---|---|
| a) Annuity Income (Issue No. 1) | $225,939.40 |
| b) Net Income from Rents (not an issue here) | 1,452.50 |
| c) Taxes Paid (not an issue here) | |
| Water Tax | 62.70 |
| Lighting Tax | 52.10 |
| d) Travel and Entertainment Expense (Issue No. 3) | 1,980.00 |

*William J. Kappel for the year 1957:*

| | |
|---|---|
| a) Annuity Income (Issue No. 1) | $202,104.10 |
| b) Interest Income (not an issue here) | 24,709.16 |
| c) Dividends v. Capital (Issue No. 4) | 3,457.32 |
| (Issue No. 4 has been resolved in favor of the taxpayer.) | |
| d) Travel and Entertainment Expense (Issue No. 3) | 3,250.00 |
| e) Informal Dividend (not an issue here) · | 2,180.00 |

It is noteworthy that in the case of both taxpayers the deficiencies in the years in question were very largely the result of their treatment of the pension-annuity question. They amount to over 80% of the deficiencies for both taxpayers.

■ The other deficiencies assessed illustrate both the minimal amount of the items and a reasonable area of conflicting opinion. William F. Kappel deducted $62.70 for "Florida Water Tax" and $52.10 for "Florida Lighting Tax" as real estate taxes paid. Despite being paid to a municipal body, these are not allowable real estate tax deductions, being in the nature of payment for proprietary governmental services, or utility bills. William F. Kappel included in "repairs" to rental real estate the replacement of a boiler at $1,452.50 which the Internal Revenue Agent determined should be a capitalized expense, a debatable distinction for a relatively small item.

In William J. Kappel's case, aside from the deficiency assessed for the pension-annuity income, which has been the subject of these and former suits, is the constructive receipt question involved in the payment of $24,709.16 by the Busch Jewelry Company and only involved in the year in which it was taxable.

William J. Kappel was also assessed for part of the salary of a chauffeur supplied by the company and a portion of dues paid by the company for club memberships, when deductions for these items were disallowed to the employer.

Both William J. Kappel and John F. Kappel were assessed for deficiencies due to failure to report as dividends certain distributions made to stockholders by publicly held corporations which had advised that these were non-taxable returns of capital. This issue (Issue No. 4) has been resolved in favor of the taxpayer.

Both William J. Kappel and John F. Kappel were assessed deficiencies from the disallowance of certain travel and entertainment expenses in the years in question. These are the subject of Issue No. 3 herein.

John F. Kappel was assessed for additional capital gain in the amount of $923.73 from the sale of real estate in 1954. The amount originally reported was the figure given him by the lawyer who handled the real estate transaction for the selling owners.

The Government in oral argument admits what is obvious here, that were it not for the deficiencies assessed for failure to include the pension-annuity income, no negligence penalty would have been assessed. Yet under the statute the five percent penalty applies to the entire deficiency and not just to the part of the deficiency found to be negligent. Mensik v. Long, 261 F.2d 45 [7th Cir. 1958].

With respect to all other items of deficiency than the pension-annuity issue we find that the taxpayers have carried their burden of proof of overcoming the presumption of neligence. It appears that with all of these items ordinary business care and prudence has been observed by the taxpayers. Miller v. United States, 211 F.Supp. 758 [D.Wyo.1962].

■ On the issues contested herein, it appears that taxpayers have reasonable grounds to differ from the conclusions of the Internal Revenue Service and should suffer no negligence penalty because of those items. Herman Senner, 22 B.T.A. 655; Robert W. Woody, 19 T. C. 350.

The pension-annuity income issue requires further discussion. Was the failure to include these very large items due to "negligence without intent to defraud?"

The annuity-income issue is a complex one. While the Government argues that taxpayers never told Mr. Winter, the accountant who prepared their returns, of the surrender of the individual pension annuities in the years in question, or sought his advice about them, there is nothing in this record to show that Mr. Winter was in any way competent to ad-

vise them on this subject. The tax consequences of qualified pension plans is not only a highly specialized field, it is a field whose mysteries are outside the normal experience of lawyers and accountants who specialize in tax practice. The court recognizes that the majority of this type of practice is conducted by life insurance companies, which advertise, promote, sell, set-up and administer these pension plans, the complexity of which would prevent even a fair-sized corporate enterprise from attempting to administer its own plan.

The taxpayers here relied entirely upon the advice and guidance of a Mr. Jules Polachek, who held himself out to deal in "corporation and partnership share retirement plans, estate and pension trusts, taxes, income insurance." He was generally reputed to be an expert in the field of corporate pension plans. He originally suggested the pension plans to the employer corporations here, he prepared the trust agreements, provided for the purchase of the funding annuities, processed applications, determined questions of coverage, and secured the approval of the Internal Revenue Service for the qualifications of the plans here. He had handled all these matters for the employing corporations for twenty years with success.

It is in view of this record of accomplishment that taxpayers relied entirely and exclusively on his advice in 1954 when he informed taxpayers that if they, without retiring from employment, would agree to the distribution of the proceeds of their pension annuities into investment annuities for members of their families they would incur no federal tax liability for federal income, gift or estate taxes. They agreed to this and Polachek handled all the details of the transactions, and nothing occurred at the time to give them warning that any tax consequences were created.

We find no negligence in this action. The funds received were income and were required to be reported as such, but it would hardly be recognized as such by laymen, even sophisticated business executives, particularly in view of the advice of the representative of the various large insurance companies involved in the transaction that no tax consequences followed. The taxpayers, without negligence, had a mistaken concept of the law, derived from an acknowledged expert. They are liable for the tax, but not for a penalty for negligence. See Bennett v. C. I. R., 139 F.2d 961 [8th Cir. 1944].

## CONSTRUCTIVE RECEIPT

One general controlling principle applies to Issues 2, 6, and 8 in this case and that is when the principle of constructive receipt applies to the taxpayers in these cases under the circumstances revealed by the Stipulation and the evidence produced.

The Government takes the position that the pension trust instrument controls and that the consequences of any actions taken must be determined by the form of the transaction under the provisions of the trust instrument. The trust instrument contained a provision that it could not be amended except in writing, and no formal written amendments were ever executed.

We took the position in the prior Kappel case [281 F.Supp. 426, aff'd, 437 F.2d 1222] that the interest of each beneficiary of the pension trust was separable because each beneficiary's share in the trust res was represented by individual annuity policies, and that no other beneficiary could be affected by what was done by these particular beneficiaries with regard to their own interests:

These taxpayers were:

(1) The principal and controlling stockholders of the employer and settlor of the pension trust;

(2) Members of the Board of Directors who controlled the appointment of the Trustees of the pension trust;

(3) Trustees of the pension trust;

(4) Beneficiaries of the pension trust, and the specific beneficiaries of the individual annuities involved in the transactions under examination in these cases.

The Kappels ran the whole show. In actual practice the existence of the trust was a legal fiction. As settlors, trustees, and beneficiaries they were free to amend the trust in any way they desired, except for the peril of losing the tax advantages. Being parties thereto, they were free to amend the trust agreement orally, or by informal correspondence. This is the law of Pennsylvania which controls these contracts. Kappel v. United States, 437 F.2d 1222, p. 1227 fn. 8; Nash v. Atlantic White Towers System, Inc., 404 Pa. 83, 170 A.2d 341 [1961]. Because the interest of no other beneficiary was affected, there was no one with legal standing to prevent the amendment to the plan. The trustees reserved the right to amend or terminate the trust except that they could not deprive any beneficiary of rights to which he became vested.

In the above-cited Kappel case we held that the plaintiffs were bound by their own actions even though they were contrary to the trust instruments. For the purpose of that decision we ignored both the legal fiction of the separate corporate existence of the employers and the separate entity of the trustees. No interests of third parties and no interest of public policy required their recognition.

■ Therefore, to the extent that any payment for the benefit of either of these taxpayers was made in the form of payment to the pension trust or to the trustees or any one of them, or required the signature of any trustee to negotiate, we hold that to be payment to and constructive receipt by the individual beneficiary or taxpayer here. No further formality of endorsement or negotiation is necessary to make the amount involved constructively received by the taxpayer.

It appears to us that the Internal Revenue Code and the Regulations specifically designate the year of receipt of income from the surrender of annuities of an employees pension trust.

26 U.S.C.A. § 402 [1954 Code].

"(a) Taxability of beneficiary of exempt trust—

(1) General rule.—Except as provided in paragraphs (2) and (4), the amount actually distributed or made available to any distributee by any employees' trust described in section 401(a) which is exempt from tax under section 501(a) shall be taxable to him, in the year in which so distributed or made available, under section 72 (relating to annuities)."

"Regulations.

§ 1.402(a)–1. Taxability of beneficiary under a trust which meets the requirements of section 401(a)–(a) in general.

(1)(i) Section 402 relates to the taxation of the beneficiary of an employees' trust. If an employer makes a contribution for the benefit of an employee to a trust described in section 401(a) .  .  .  ., the employee is not required to include such contribution in his income except for the year or years in which such contribution is distributed or made available to him. .  .  .".

"Regulations.

§ 1.451–2. Constructive receipt of income.—General rule.

Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions  .  .  .  .".

## ISSUE NO. II

When the pension plans were originally established the employers by the terms of the pension trust agreement were to pay the entire premium. Each premium payment bought an individual annuity policy for the benefit of a named-employee. The Internal Revenue Service in auditing the corporate returns of the employers found the premium contribution made for the annuities of John F. Kappel, William J. Kappel and on Harold Busch (not involved in these cases) to be excessive for the purpose of allowable tax deductions for these corporations. Not wishing to reduce the amount of the annuities being purchased, John F. Kappel, William J. Kappel, and Harold Busch, who were the controlling stockholders of the corporations involved, as well as trustees of the pension trust, as well as beneficiaries, agreed to pay direct to the insurance company the amount of the premium over and above the amount paid by the employer. The employer paid nothing over and above the amount allowed it as a deduction. This policy was followed year after year.

██ The plan allowed for amendment or cancellation by the employer (except for vested benefits). It required the amendment to be in writing. However, all parties to the agreement, employer, trustee and beneficiary, effected this amendment orally, and by correspondence and actual performance, and such amendments to contracts are valid, even in face of a contract term requiring changes or amendments in writing.

In assessing John F. Kappel and William J. Kappel for receipt of the proceeds of the surrendered pension plan annuities, the Government has assessed the entire proceeds of such annuities as income to each of the taxpayers in the years 1954, 1955, 1957 and 1958.

Sections 72(e)(1)(B) and 72(f) of the Internal Revenue Code provide that to the extent that taxpayers personally were required to pay premiums on these annuities they are entitled to a reduction on the income received by the cash surrender value of the annuities.

The Government argues that plaintiffs were not required to pay any part of the premium on the annuities because the pension plans were non-contributory in nature and the premium payment for the amount of annuity contracted for was entirely the obligation of the employer. This obligation was not absolved by the Internal Revenue Service disallowance of the deduction on the excess portion of the premium. The corporation could have continued to pay the full premium, or it could have reduced the amount of the annuity contracted for.

The Government contends that this obligation remains unless amended in writing, and until it was so amended the taxpayers were contributing funds to meet a corporate obligation, that is, investing additional capital, which became funds of the corporation over which the stockholders had no further control.

This disregards the entire body of evidence that demonstrates that the Kappels were the corporation, principal stockholders, controlling directors, managing officers, trustees of the pension fund, and beneficiaries of the annuities. What they could have accomplished by corporate resolution and written amendment they did by oral agreement with the assent of all parties involved. Furthermore, the specific evidence is that no money was paid by the taxpayers to the corporation for these additional premiums, they were paid by taxpayers direct to the insurance companies involved.

██ Therefore, we hold that John F. Kappel and William J. Kappel are entitled to reductions in income assessed to them for the years 1954, 1955, 1957 and 1958, by reason of receipt of cash surrender value of pension plan annuities to the extent of premium payments made by them to the insurance companies involved. Computation of the amounts of such payment has been reserved for later determination.

## ISSUE NO. VI

Two of the pension trust annuity policies for the benefit of William J. Kappel were surrendered in 1954. The insurance companies paid the proceeds in a total of $65,465.06 by checks dated November 26, 1954 and December 3, 1954, which were endorsed by John F. Kappel as trustee and turned over to Polachek for investment in the individual annuities for members of William J. Kappel's family. When the total of $65,465.06 was included in William J. Kappel's income from receipt of surrendered annuities in 1955, William J. Kappel protested and upon reconsideration the Internal Revenue Service reduced the receipts from the two annuities (John Hancock, Policy No. 040561, and American, Policy No. A762608) in 1955 from $65,465.06 to $15,365.06, on the grounds that $50,100 of these proceeds were made available to William J. Kappel in 1954 by the purchase of individually owned annuities for members of his family, but that the remaining $15,365.06 was not reinvested in such annuities until 1955 and was, therefore, not available to the taxpayer until that year.

(The importance of this question for the taxpayer is that the statute of limitations bars any further deficiency assessment for 1954).

The above summary represents the most succinct summary of the mass of transactions represented in the stipulations, exhibits, and testimony on this issue. We believe the summary sufficient for the determination of the legal question involved.

The Internal Revenue Service ruling is based on the date that the money was used to purchase additional annuity policies. The government argues that the trustees were in sole possession of the entire cash surrender value of $65,465.06 until the money was distributed to the beneficiary. The government admits that the $50,100 was distributed to William J. Kappel in 1954 and used by him to purchase additional annuity policies, but it contends that the additional $15,305.06 was not given to him until 1955 and, therefore, should be included in his 1955 tax return.

■ Once again we must turn to the prior Opinion in this case where we said that the trustees and the beneficiaries were one and the same and, therefore, when the trustees had possession of the money it was the same as the beneficiaries having possession. It is not disputed that the entire $65,465.06 was in the possession of the trustees in 1954. This money or any portion of it could have been used by the beneficiary anytime he chose and, therefore, being consistent with our prior ruling the entire amount should have been included in the plaintiff's 1954 income tax return. It has been stipulated by the parties that the applicable statute of limitations has run and that no assessment for additional income taxes can be imposed upon the plaintiff if this $15,365.06 is to be included in his 1954 income tax return.

## ISSUE NO. VIII

The eighth issue presented to this court is whether an annuity policy surrendered in December 1957 should be included in John F. Kappel's income tax for 1957 or 1958. The United States has included the sum of $12,209.63, the cash surrender value of this policy, in the plaintiff's gross income for both 1957 and 1958. The Government readily concedes that this is double taxation for the same income and merely wants a determination as to whether this income should be taxed in 1957 or 1958.

Sometime in 1957 the trustees of one of the pension funds surrendered an annuity policy for the benefit of John F. Kappel issued by Dominion Life Assurance Company of Canada. Neither party has been able to determine the exact date when this annuity was surrendered. On December 30, 1957, Dominion issued a check in the amount of $12,209.63, with the trustees as payors. Neither party knows the exact date as to when the check was received by the trustees. However, it is known that John F. Kap-

pel as Trust-Secretary endorsed the Dominion check and deposited the check in the trust bank account. The check shows bank clearing stamps dated January 15 and 16, 1958. These funds were not used by the beneficiary John F. Kappel until late January 1958.

Neither party nor the court has been able to find any case law substantiating the position of either party as to when this money became taxable. The plaintiff contends that 1957 is the applicable year because that is the year the annuity was surrendered; the government claims that 1958 is the applicable year because it is that year, in all probability, when the money was actually received. The government also contends that 1958 would be the year because the beneficiary did not use this money until 1958. We again disregard this argument because as we have said before the trustees and the beneficiaries are one and the same people. We conclude that 1957 is the year applicable for the taxation of this money. Once an annuity policy is surrendered the beneficiary or the trustee has an absolute right to the proceeds of that policy. Whoever surrendered the policy cannot revoke that decision and ask that the policy remain in effect. It is a decision that once it is made cannot be changed.

It appears to this court that the rule should be that the date that the annuity policy is surrendered is the date upon which the income should be taxed. It is apparent that an individual considers the tax consequences of surrendering an annuity policy and that this decision influences an individual in determining which year he should surrender that policy. For example, if a policy were surrendered in September but because of administrative procedures on the part of the insurer the check is not mailed until the following year, then under the government's theory the individual would be taxed in the year he received the check instead of the year he surrendered the policy which might alter substantially his taxable income. This would be an unjust result. If on the other hand the individual surrendered his annuity policy in September and received a check for the proceeds on October 1, he could not sit idly by until December 31 to decide whether or not he should cash that check to see if it would have a favorable tax result in that year, or cash it on Jaunary 2, the following year. It appears to the court that either of the aforesaid examples could lead to abuses and tax liability not contemplated by the insured. Therefore, we find that said income was received in 1957.