Elliet N. ARONSON, et al.,
Plaintiffs, Appellees,

v.

SERVUS RUBBER, DIVISION OF CHROMALLOY, et al., Defendants, Appellants.

No. 83–1468.

United States Court of Appeals,
First Circuit.

Argued Jan. 5, 1984.
Decided March 21, 1984.

Jeffrey L. McCormick, Springfield, Mass., with whom Law Offices of Robinson Donovan Madden & Barry, P.C., Springfield, Mass., was on brief, for defendants, appellants.

Francis D. Dibble, Jr., Springfield, Mass., with whom Charles W. Danis, Jr., and Bulkley, Richardson & Gelinas, Springfield, Mass., were on brief, for plaintiffs, appellees.

Before COFFIN, ALDRICH and BOWNES, Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

Nine plaintiffs, all former employees of Servus Rubber Division of Chromalloy American Corporation, hereinafter, sometimes, defendant, instituted this action under the Employee Retirement Income Security Act [ERISA], 29 U.S.C. § 1132, to recover benefits allegedly due them under defendant's profit sharing plan. The district court, 566 F.Supp. 1545, granted relief to all plaintiffs, and additional relief to plaintiff Aronson, and all defendants appeal.

Servus Rubber Division of Chromalloy is headquartered in Rock Island, Illinois, and during 1980 operated two plants, one in Chicopee, Massachusetts, known as the Vinyl Division, and one in Rock Island, where the rubber products were made. During 1980, Chromalloy expressed its intent to divest its Consumer Products Group, including Servus, as part of a general scheme of divestiture. On August 28, 1981, Chro-

malloy sold the assets of the Chicopee plant and immediately began laying off employees and winding up the business. Over one half of the 64 plan participants at the Chicopee plant left defendant's employ within a month, and by January 1, 1982, only eleven remained, including the nine plaintiffs. Throughout this time, business at Servus' Rock Island plant continued as usual.

The plan at issue is entitled "Servus Rubber Division of Chromalloy American Corporation Employees' Profit Sharing Plan," and originally encompassed employees at both plants. The plan is intended to comply with Internal Revenue Code and ERISA standards governing qualified employee benefit plans. Section 4.1, governing company contributions, states that prior to the end of each year, the company will decide, "in its sole discretion," the appropriate contribution for the year. Its only obligation in this regard is that, "to the extent there are net profits available, the Company shall contribute an amount equal to three per cent (3%) of the compensation of all participants." All qualified participants employed on December 31 are entitled to share in the contribution. However, under section 11.3 the company could amend the plan "at any time," and under section 12.1 terminate the plan and/or discontinue contributions, without limitation—unless effecting a discrimination. 29 U.S.C. § 1140. Upon the occurrence of a partial termination, the plan provided, in accordance with the Tax Code, 26 U.S.C. § 411(d), that all prior contributions to the terminated employees became 100% vested. At issue here are the rights to and in Servus' 1981 contributions.

Servus did not show a profit in 1981, and was, accordingly, under no obligation to contribute. It did, however, make a contribution equal to 8% of the yearly salaries of all participating employees at the Rock Island plant. It made none on behalf of the Chicopee employees, although plaintiffs were still in its employ on December 31, nor were they allowed to share in the contributions made, defendant claiming the plan was partially terminated or amended with respect to Chicopee. Plaintiffs disputed both of these contentions, adding that a partial termination as to them would have been discriminatory. The court found for plaintiffs, holding that defendant failed to take the proper action to accomplish either an amendment or a partial termination, and that, in any event, such a termination would have been discriminatory. This we reverse.

The vote on which defendant primarily relies is that of the Pension Committee, on November 25, 1981:

> RESOLVED, that the Servus Rubber Division of Chromalloy American Corporation Employees' Profit Sharing Plan be *partially terminated* with respect to those participants who were employees of the Servus Vinyl Division at the date of the announcement to close down that operation with the date of termination and valuation, as defined in the plan, be established as September 30, 1981, effective September 30, 1981, ... (Emphasis suppl.)

This read "terminated," not "amended." Defendant's problem arises from the fact that, while the Pension Committee had full power to amend the plan,[1] termination had to be by the company.[2]

Defendant contends that, under the Treasury Regulations, a partial termination

---

1. 11.3 *Amendment.* The Company reserves the right to amend the Plan at any time by written resolution of the Pension Committee of Chromalloy American Corporation, .... Any amendment may, by its terms, be retroactive. Each amendment and the retroactive application thereof, if any, shall become effective upon delivery to the Trustees of a written instrument executed by the Company, setting forth the terms and provisions thereof.

2. 12.1 *Event of Termination.* The Company, with the approval of the Pension Committee of Chromalloy American Corporation, reserves the right to terminate the Plan and Trust, or to discontinue completely Company contributions, by giving written notice of the date of such termination or discontinuance, hereinafter referred to as the "Date of Termination", to the Trustee.

took place by operation of law, *see* 26 C.F.R. §§ 1.401–6(b), 1.411(d)–2(b), a matter which could raise considerable difficulties in some cases—*but cf. United Steelworkers of America v. Harris & Sons Steel Co., Inc.*, 3 Cir., 1983, 706 F.2d 1289, 1297–99—but which we need not reach. We hold the plan was adequately complied with.

■ Plaintiffs concede that defendant intended to partially terminate, but assert, first, that the termination provision, 12.1, ante, does not provide for partial terminations, and second, that defendant failed to comply with 12.1 in any event. As to the first, we note that the plan must be construed as a whole. Although it is true that section 12.1 only reserves the "right to terminate," its companion section, 12.2, requires 100% vesting "[u]pon ... partial or complete termination." Manifestly both are comprehended in section 12.1.

Second, section 12.1's requirement of "approval of the Pension Committee" was met by the Committee's resolution. This not only contained appropriate language, but it is part of a document whose heading reads, "Unanimous Written Consent of the Pension Committee." Nor, although plaintiffs seek to make much of it, can there be any doubt as to the intended date, in light of the language of this Resolution. Plaintiffs' contentions are reduced to saying that written notice thereof was not given to the trustees, and that, whereas the committee voted to terminate, it does not appear that the "Company" took action.

■ This last is an unsustained technicality. There is nothing in the plan requiring the Company to manifest its action in any particular manner. In this case the scenario started with a letter to the individual participants, reading in part as follows.

Dear Plan Participant:

The decision has been made to terminate the Servus Rubber Profit Sharing Plan as it relates to those participants at the Chicopee facility and to distribute the funds attributable to those participants. An application is to be made to the Internal Revenue Service for a determination on this partial plan termination. Normally, the IRS review of a plan termination is completed in 90–120 days. Upon receipt of IRS approval the plan Trustees will take immediate action to distribute the account balances to these Chicopee participants.

Sincerely,
SERVUS RUBBER COMPANY
S/ Don Tobin
President
S/ John L. Caruso
Vice President Finance.

Following this, an application for determination upon termination, executed by John L. Caruso, Vice President Finance, Servus Rubber Co., was filed with the IRS. In the pretrial stipulation plaintiffs agreed,

15. On November 12, 1982, *Chromalloy* submitted an Application for Determination Upon Termination to the Internal Revenue Service. A copy of this application on Form 5310 along with the documents submitted therewith is contained in the documentary appendix as Exhibit 8. (Emphasis suppl.)

Chromalloy is the Company. We cannot accept plaintiffs' post trial contention that the Company was a stranger to the termination.

It is equally empty to charge that the "Trustee" did not receive written notice. There were, at the time, two trustees, Tobin and Caruso. It should be enough that they signed the original notification of termination as president and vice president of Servus, respectively. Nor could they have been unaware of the subsequent requested consent, and the response of the Pension Committee, ante. And, finally, Caruso signed the Company's notification to the IRS. No greater compilation of documents was required. *Cf. Kappel v. United States*, W.D.Pa., 1974, 369 F.Supp. 267, 275.

Our dissenting brother complains that we are elevating substance over form, a criticism we reject only because we believe the deficiencies so minor. Form can be important, but we see nothing here that seems of moment. True, it does not appear

that both trustees were given the date of partial termination in writing, but this is hardly a case warranting doubts, or requiring speculation as to the trustees' knowledge that partial termination was approved. The precise date was of no significance. Whenever the termination could be said to have occurred, whether in August, September, or when the Pension Committee voted in November, it was before plaintiffs had qualified to share in any contribution.

■ There remains plaintiffs' allegation that they were discriminated against, in violation of 29 U.S.C. § 1140.[3] This is a misreading of a section which relates to discriminatory conduct directed against individuals, not to actions involving the plan in general. The problem is with the word "discriminate." An overly literal interpretation of this section would make illegal any partial termination, since such terminations obviously interfere with the attainment of benefits by the terminated group, and, indeed, are expressly intended so to interfere. Such cannot be the intent of the section, where the statute expressly recognizes partial terminations. *See* 29 U.S.C. § 1343(b)(4) (incorporating Tax Code definitions, 26 U.S.C. § 411(d)(3)). This is not to say that a plan could not be discriminatorily modified, intentionally benefitting, or injuring, certain identified employees or a certain group of employees, but a partial termination cannot constitute discrimination per se. A termination that cuts along independently established lines—here separate divisions—and that has a readily apparent business justification, demonstrates no invidious intent.

■ Nor can discrimination be established merely because the termination falls unevenly on employees who remain employed for differing lengths of service in connection with winding up a business. Such events are expressly anticipated in the regulations.[4] The case at bar is a typical example. Under the terms of the plan, from the beginning, the great number of the employees, discharged in November or earlier, could receive no benefits for the year 1981. In this there would be no possible impropriety. Plaintiffs' claim for benefits is based on the fact that they remained until January, viz., after the accounting date December 31, 1981. If they were to receive benefits, it would be for the entire year, full benefits for 12 months as against no benefits whatever for the others, although the others had been employed most of the year. If one is to talk discrimination, plaintiffs are seeking discrimination in their favor when nothing separates them from the others but a few weeks employment, and the plan, with the business, is being terminated. We adhere to what was said in the regulation.

■ Nor can plaintiffs claim they were discriminated against with respect to participants in defendant's Rock Island operation that was not being closed down. The dissent asserts that Chicopee and Rock Island were but two plants, not "two divisions of a company, nor . . . two branches." This would seem but semantics; they were not only widely separated, but engaged in different production. More important, one was sold, the other was not. This was a profit sharing plan; with no profits the company had no obligation to contribute. We cannot regard it as discriminatory for defendant to make voluntary contributions to continuing employees to maintain their morale, but not to make such to departing employees of the admittedly profitless, wound-up, branch of its business. We hold

---

3. "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act. . . ." 29 U.S.C. § 1140.

4. "For example, a plan is terminated when, in connection with the winding up of the employer's trade or business, the employer begins to discharge his employees." 26 C.F.R. § 1.401–6(b).

the plan was validly terminated, and there are no 1981 benefits due any plaintiff.

In Count 2 plaintiffs Aronson and Crivelli sue on contracts to award them special severance pay for a stated number of months, plus "fringe benefits." These contracts arise from letters sent by defendant to these two plaintiffs, early in 1981. Plaintiffs claim that "fringe benefits" included regular contributions to the pension plan. Unaccountably, defendant offered no evidence of anything else that might be so regarded. Under such circumstances it was only natural for the court to adopt plaintiffs' construction. There is a difficulty, however. Aronson was the highest paid, and Crivelli one of the highest paid, employees of the vinyl facility. To include them specially in the pension plan, to the exclusion of all lesser paid employees, would seem exactly the type of preferential discrimination that the Tax Code prohibits, and that could affect the tax-exempt status of the plan. *See* 26 U.S.C. § 401(a)(4) & (5); *Cornell-Young Co. v. United States*, 5 Cir., 1972, 469 F.2d 1318, 1323–25. We decline to construe the letters as effecting such a change here.

This does not mean that defendant is to escape altogether its promised obligations. There is no reason why it should not be charged with paying plaintiffs the dollar amounts directly that it undertook to pay into the plan on their behalf. This means that Crivelli should be paid 8% of his 1981 salary. Aronson was promised severance pay through 1982. Consequently, in addition to his promised 1982 salary, he should receive both the 8% 1981 contribution, and the amount of whatever, if any, would have been contributed to the plan in 1982 in his behalf had he been a participant. This, however, is a contract, and not an ERISA recovery, and while there is pendent jurisdiction, there is no basis for the statutory award of counsel fees.

Aronson and Crivelli have failed to prove any other undertaking falling within the meaning of fringe benefits. The judgment of the district court is vacated; judgment to be entered for Aronson and Crivelli in accordance with this opinion,[5] but in all other respects, judgment for defendants.

COFFIN, Circuit Judge (dissenting).

I view the issue before us as one where insistence on at least substantial compliance with detailed requirements is amply justified by the nature of the problem, the intent of the relevant legislation, and the difficulties created by elevating substance over form. On this record, involving a mixed question of fact and law, I cannot say that the district court committed clear error (if error at all), *Lynch v. Dukakis*, 719 F.2d 504, 513 (1st Cir.1983), and would affirm.

I begin by observing that the decision was not directed to one of two divisions of a company, nor to one of two branches. It was aimed at one of two plants of one division of a company. I therefore approach the case much as if the purported termination concerned the workers in one of two buildings. When I reflect in addition that the plaintiffs, at the time of receiving notice of termination, had worked eleven months of the year—and thereby had contributed most of their year's work at the end of which they would expect the company's annual contribution—I do not think it unrealistic to expect a presumably well advised employer to adhere with some care to its own plan.

Here, of course, no case can be made that the company amended the plan. The court properly does not rest on any retroactive amendment. Instead, it rests on a partial termination. In so doing, I fear it strains unduly. It finds authority in the mention of the words "partial ... termination" in a 1976 plan amendment to a provision other than section 12.1, which creates the basic right to terminate. Moreover, although section 11.3 explicitly provides for

---

**5.** It is not clear from the record, including the court's order, whether, on remand, defendant Servus Rubber Division or, possibly, defendant Chromalloy American Corporation, is the one against whom this money judgment should run.

retroactive amendments, section 12.1 is silent not only as to partial terminations but as to retroactive ones. Absent some authority for retroactive effect similar to that covering amendments in section 11.3, I question the validity of such terminations.[1] The court, however, assumes that "written notice of the date of ... termination" can be given, although the date has long since passed into history.

Section 12.1 clearly identifies three ingredients of a legal termination: a company exercise of the right to terminate, approval by the Pension Committee, and the giving of written notice of the date of termination to the Trustee. Here we see an undated company letter announcing its decision to terminate the plan subject to an Internal Revenue Service determination, signed by the President and Vice President Finance of Servus Rubber Company. The stipulation tells us only that this was distributed "[s]ometime subsequent to August 28, 1981". This letter gave no indication of a date of termination. On November 12, 1982 the company submitted its application, signed by its president, to Internal Revenue Service. As the district court noted, the application did not indicate that the termination would be "partial" or that the Plan would continue in existence.[2] Some two weeks later, on November 25, 1981, the Pension Committee voted the partial termination, to be effective as of September 30, 1981.[3]

As of November 25, 1981, therefore, the evidence consists of an undated letter of decision to terminate, with no date of termination, sent to participants at some unknown time, followed by a generalized application to the Internal Revenue Service,

and purported retroactive approval of the partial termination by the Pension Committee. But even if we blink at all other deficiencies, we face the further fact that at no time has there been compliance with section 12.1's requirement of "written notice of the date of such termination ... to the Trustee".

The court sees the absence of such written notice as cured by the happenstance that the "Trustee" consisted of the two company officers who originally had notified the plan participants that there had been a decision to terminate. The court adds that these officers could not have been unaware of the Pension Committee's subsequent resolution. My problem with this "commonsense" approach, based on assumptions as to who knew what and when, is that it invites litigants and courts to consider the adequacy of conduct not conforming to the plan and to determine what may be accepted as a satisfactory equivalent. For example, had there been no written evidence of a company decision at all, a court might sensibly find that the company officers-trustees met daily with members of the Pension Committee and surely must have known of the Committee's approval. By the same token, amendments would be susceptible to similarly informal proof. The result would surely be infinitely complex if not unworkable.

The outcome in this case seems to me quite at odds with the terms and policy of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq., which place a premium on the scrupulous administration of pension plans. Section 1104 of ERISA, for instance, requires plan trustees to discharge their duties "in

1. The district court found no basis in the Internal Revenue Code, regulations, or interpretative rulings for applying partial termination to workers kept on long after the termination date "especially where that date and an attendant accounting or valuation date are established retroactively".

2. In January of 1982, Internal Revenue Service replied, stating that "termination of this plan does not adversely affect its qualification for federal tax purposes".

3. Even evidence of this action fails to conform with section 14.2 of the plan which requires that "Any action by the Company pursuant to any of the provisions of this plan shall be evidenced by a copy of a resolution of the Pension Committee of Chromalloy American Corporation, certified by its Secretary or Assistant Secretary." What is before us, as an exhibit to the stipulation, is a copy of a resolution signed by the three members of the Pension Committee, but lacking any certification.

accordance with the documents and instruments governing the plan ...." 29 U.S.C. § 1104(a)(1)(D). Section 1104 was enacted in evident response to Congress's concern about "the conduct of administration and operations of pension plans", H.R.Rep. No. 93–533, 93d Cong., 1st Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 4639, 4645, and was intended to "place a ... duty on every fiduciary ... to act ... in accordance with the documents and instruments governing the plan ....", *id.* at 4651. What we said, pre-ERISA, in *Hoefel v. Atlas Tack Corp.*, 581 F.2d 1, 7 (1st Cir.1978), seems to be as valid today: "Where the employer establishes the terms of a pension plan, those terms should be construed in favor of the employee."

I would affirm the judgment.