James NEMETH, Dale Michael, Albert Blaha, Willie D. Burnett, Jerry G. Fife, Andrew Kendall, Euiel D. McCarty, Frank Montgomery, Willie Renfroe, Raymond Spears, Louis Spletzer, George Surch, Lawrence Taylor, Ben Waldschmidt, Devern E. Walker, Duane Ward, William Ward, Lester Wares, Robert Wares, and Larry L. Zielke, Plaintiffs,

v.

CLARK EQUIPMENT COMPANY, Defendant.

No. K84–433.

United States District Court, W.D. Michigan.

Oct. 14, 1987.

Frank J. Chambers, Martin R. Sturm (Chambers, Steiner, Mazur, Ornstein & Amlin, P.C., Kalamazoo, Mich.), Karen L. Melvin Chambers, of counsel, for plaintiffs.

Donald A. Van Suilichem, Jennifer S. Buckley (Clark, Klein & Beaumont, Detroit, Mich.), for defendant.

## OPINION

ENSLEN, District Judge.

Clark Equipment Company ("Clark") is a manufacturer of material handling equipment, construction machinery, and components. Until February 1983, Clark operated a construction machinery plant at Benton Harbor, Michigan. Plaintiffs are eighteen (18) former Clark employees who lost their jobs, and their full pensions, when Clark closed its Benton Harbor plant in February, 1983. Each plaintiff's employment was terminated when the plant closed. Clark transferred the production formerly accomplished at Benton Harbor to the two remaining plants in its construction machinery division, located in St. Thomas, Ontario and Asheville, North Carolina.

The average employee at Benton Harbor had 25.4 years seniority and was 51.9 years old. These employees were represented by the United Automobile Workers Union, Local 1290. The workforce at the Asheville plant was non-unionized, younger and had less than five years' seniority with Clark.

Plaintiffs originally brought their case in Michigan state court, claiming that Clark's decision to close the Benton Harbor plant violated Michigan's Elliott–Larsen Act by discriminating against the plaintiffs on the basis of their age. Among plaintiffs' claims was the claim that Clark discharged them in order to avoid paying them their full pensions. Clark successfully removed the case to this Court on the theory that plaintiffs' claims relating to pension benefits were preempted by section 510 of the Employees' Retirement Income Security Act ("ERISA"). 29 U.S.C. § 1140. This Court accepted jurisdiction over plaintiffs'

pendent claims and held trial beginning August 18, 1987. Plaintiffs' age discrimination claim was tried to a jury; the ERISA Claim was tried to the Court. Plaintiffs won a jury verdict on their age discrimination claim. The Court must now decide plaintiffs' claim under ERISA.

In 1982 Clark's President and Chief Executive Officer, James Reinhart, determined that Clark was in serious financial trouble. The world-wide recession of the late 1970s and competition from foreign manufacturers had resulted in a drop in sales of nearly 41% between 1979 and 1982. Clark reported losses of $234 million in 1982. Defendant's Exhibit C. Reinhart determined that Clark might go bankrupt by the end of 1982 unless the company took drastic steps to reduce its production capacity and overhead costs.

To that end, Clark began to consolidate its operations. In order to determine which plants, if any, to close, Clark conducted a series of plant capacity studies. Studies were conducted within each of the company's divisions, but since this case concerns only the construction machinery division, the Court's discussion is limited to that study. See, Defendant's Exhibit MM.

The construction machinery division had three plants: Benton Harbor, St. Thomas and Asheville. The company decided it could not close St. Thomas since duty restrictions would prevent it from competing in the Canadian market if it did not manufacture a portion of its product in Canada. The plant capacity study evaluated both Clark's options (eliminate Benton Harbor or eliminate Asheville) against a base case, or "do nothing" scenario. On the basis of this study, Clark decided to close the Benton Harbor plant. It announced this decision to the Benton Harbor workforce in early October, 1982. The plant actually closed in February, 1983.

Plaintiffs claim that Clark chose to close Benton Harbor instead of Asheville because of the increased pension expense Clark would incur if it allowed the Benton Harbor workforce to work until normal retirement age. Clark's hourly workforce

was covered by the Benton Harbor Plant Hourly–Rate Employee's Pension Plan (the "plan"). Under the plan, a worker's right to pension benefits vested after ten (10) years of service. An early retirement benefit allowed workers to retire with a fraction of the full pension benefit. The amount of this vested deferred benefit depended upon the years of service accumulated by the employee and upon whether the employee collected the benefit before or after reaching the age of sixty-five (65). An employee could qualify for full retirement benefits ($935/month, retiree insurance and other benefits) in one of two ways: the "30 and out" provision allowed retirement after thirty (30) years' service; the "85 point" system allowed retirement when an individual's age plus years of service equalled 85. The plaintiffs in this case were within months or years of full retirement under one of these two definitions.[1] As a result of the plant closing, each plaintiff lost the right to qualify for full retirement benefits. Defendant's Exhibit U.

Beginning in July, 1983 Clark engaged in negotiations with the union representing plaintiffs to determine the separation pay, transfer rights and other rights of the Benton Harbor employees. These negotiations culminated in the signing of a Plant Closing Agreement ("Agreement") between Clark and representatives of the International Union.[2] Pursuant to this Agreement, employees not eligible for retirement before June 17, 1983 could not thereafter become eligible for full retirement benefits. The age of each employee was frozen as of June 17, 1983 to prevent employees from "creeping" into retirement eligibility under the 85 point plan.

■ Section 510 of ERISA prohibits employer conduct taken against an employee who participates in a pension benefit plan for "the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. As the Sixth Circuit noted in *West v. Butler,* 621 F.2d 240, 245 (6th Cir.1980), this prohibition was "aimed primarily at preventing unscrupulous employers from discharging their employees in order to keep them from obtaining vested pension rights." In order to prevail under this section, plaintiffs must prove that the defendant made the decision to discharge them from employment with the specific intent to violate ERISA. *Gavalik v. Continental Can Co.,* 812 F.2d 834, 851 (3rd Cir.1987); *McKay v. Capital Cities Communications, Inc.,* 605 F.Supp. 1489, 1491 (S.D.N.Y.1985); *Garry v. TRW, Inc.,* 603 F.Supp. 157, 162 (N.D.Ohio 1985).

■ Plaintiffs need not prove that defendant's desire to interfere with their pension benefits was the *sole* reason for their termination. Rather, "§ 510 of ERISA requires no more than proof that the desire to defeat pension eligibility is 'a determinative factor' in the challenged conduct." *Gavalik* at 860. Once the plaintiffs establish that the desire to avoid pension liability was a determining factor in the decision to terminate their employment, the defendant, in order to avoid liability, must prove, "that it would have reached the same conclusion or engaged in the same conduct in any event, i.e., in the absence of the impermissible consideration...." *Id.* at 863. If the employer carries its burden to prove an alternative nondiscriminatory justification, the plaintiffs must then demonstrate that the proffered justification is a mere pretext, or that the discriminatory reason *more likely motivated the defendant's action. Id.* at 853.

■ In this case, plaintiffs' proof that Clark made the decision to close the Benton Harbor plant in order to prevent plaintiffs from obtaining their full retirement benefits consisted primarily of documents comparing payroll, pension expenses and other costs at the Benton Harbor and Asheville plants. Pension expenses at Benton Harbor would have amounted to $7.005 million

---

1. The plaintiff with the most seniority had 27 years of service; the plaintiff with the least seniority had 13.85 years of service. Pretrial Order at 8.

2. When the local union representing plaintiffs refused to sign the Plant Closing Agreement, the International decertified the local and signed the Agreement.

over the relevant five (5) year period,[3] while those at Asheville would have come to only $1.096 million. Plaintiffs' Exhibit 2. According to plaintiffs' expert, the difference in pension costs, before accounting for union cost-cutting proposals and differences in efficiency between the two plants, amounts to 26.79% of the total difference in direct labor costs between the two plants. Plaintiffs' Exhibit 66.[4] The overall difference in operating costs between the two plants was $26.9 million. Defendant's Exhibit MM. Pension costs amounted to slightly less than 22% of this difference.[5] Pension costs thus amounted to slightly more than one-fifth of the cost difference between the two plants.

Plaintiffs' offered other evidence to show that Clark's decision to close the Benton Harbor plant was motivated by its desire to prevent plaintiffs from obtaining their full retirement benefits. Ken Ward, a former Clark employee, testified that Paul Schultz, former manager of the Benton Harbor plant, told him that "the pension costs were killing us." This comment was made during discussions about the possibility that Clark would close the plant.

Next plaintiffs point to a number of limitations placed on Benton Harbor employees' transfer rights, to show that Clark intended to prevent them from transferring to Asheville and acquiring the necessary years of service to qualify for retirement. The Plant Closing Agreement limited transfer rights to able-bodied workers who had accumulated eighty (80) hours of service on or after October 6, 1982. Defendant's Exhibit U. Thus, disabled employees, employ-ees working under medical restrictions and employees who had previously been laid off were completely denied the opportunity to transfer. Several plaintiffs fall into this category.[6] Clark required those employees offered the opportunity to transfer to sign a waiver and release, Plaintiffs' Exhibit 7, before they could begin work at Asheville. In addition, the transferees had to report for work at the North Carolina plant within fourteen (14) days of receiving the transfer notice.[7] Benton Harbor employees transferring to Asheville lost all seniority for purposes of job-bidding and protection from lay-offs, thus they would have been among the first employees to lose their jobs had the company decided to reduce its workforce once again.

While Clark refused to allow disabled or medically restricted Benton Harbor employees the opportunity to transfer, at least one witness who visited the Asheville plant testified to seeing disabled workers on the job there.[8] In addition, although laid-off Benton Harbor employees could not transfer to Asheville, the company employed up to one hundred (100) temporary employees at the Asheville plant. The testimony of Ken Ward and Louis Spletzer showed that these temporary employees were present at the Asheville plant after the Benton Harbor plant closed. Robert Johnson, employee relations manager at Asheville, testified that Clark presently employs twenty (20) temporary employees at Asheville.

The Court finds that this evidence is sufficient to make out a *prima facie* case of pension discrimination in violation of section 510 of ERISA. 29 U.S.C. § 1140.

---

3. Defendant's decision was based on an estimate of costs over the five year period from 1983 to 1987. Testimony of Raymond Perrone.

4. While the court notes that Dr. Strobel is a qualified expert in the field of economics, it cannot give great weight to Dr. Strobel's conclusions. The Court agrees with defendant that his attempt to adjust hourly wages at both plants by the plant's efficiency rating was improper, since the hourly wages already accounted for the difference in efficiency between the two plants. Defendant's Response to Plaintiffs' Post–Trial Brief, at 6. Thus, the Court will disregard that aspect of Dr. Strobel's testimony.

5. The difference in pension costs between Benton Harbor and Asheville, for the years 1983–1987, as shown on Plaintiffs' Exhibit 2, is $5.909 million. This is 22% of the $26.9 million difference in operating costs.

6. See the testimony of Duane Ward (medical restrictions), Willie Renfroe (medical restrictions), and Raymond Spears (laid-off).

7. Some employees received even less time to move themselves, their belongings and their families from Michigan to North Carolina. See, Testimony of Ken Ward.

8. See, Testimony of Louis Spletzer.

Pension expenses were a significant item of cost making Benton Harbor more expensive to operate than Asheville. It is undisputed that the defendants considered these costs in making its decision to close the Benton Harbor plant. The Court cannot say that an expense amounting to more than twenty (20%) percent of the difference in operating expenses between the two plants was not *a* determining factor in Clark's decision to close the Benton Harbor plant, although obviously it was not the sole reason for that decision. The evidence regarding transfer rights further demonstrates Clark's attempts to consolidate those savings by preventing the older and more senior employees from transferring to the Asheville plant and accruing the years of service necessary to obtain full pension benefits. Clark denied transfers to disabled, medically restricted and laid-off employees even though it had the ability to employ many of these individuals.[9] Even the employees who qualified for transfer had to waive potentially valuable legal rights and hastily move themselves and their families to North Carolina in order to obtain work. These facts, taken together with plaintiffs' direct evidence, are sufficient to show that Clark's decision was motivated, at least in part, by its desire to avoid paying full retirement benefits to the Benton Harbor workforce.

■ The Court must now determine whether the defendant met its burden of showing that it had a legitimate, nondiscriminatory reason for its actions. *Gavalik* at 853. The Court finds that Clark has met that burden. Clark produced an enormous amount of documentary evidence to establish its alternative justification for the decision to close Benton Harbor. Clark claims that it based its decision on a number of economic considerations, and that no one item of cost was singled out as the cost responsible for Benton Harbor's closure. Clark argues that it considered only "the

bottom line," an elusive accounting concept which defied definition by any witness. For Charles Kiopes, General Manager for Construction Machinery, the bottom line was net gross margin. The plant capacity study showed a $33 million advantage in favor of closing Benton Harbor. Defendant's Exhibit K. James Reinhart and Raymond Pirrone said they also considered other items, including pretax income ($30 million advantage in favor of closing Benton Harbor), return on sales (1.3% advantage), return on assets (2.8% advantage), and operating expenses ($26.9 million advantage). Each Clark witness testified that his decision to recommend closing the Benton Harbor plant was based on a consideration of the entire study, and not solely upon a consideration of pension costs or even of direct labor costs.

■ While the Court is persuaded by Clark's evidence, it believes that Clark has over stated its case on the law. Clark's first argument is that a plaintiff cannot prevail under section 510 where, "elimination of jobs and termination of benefits were attributable to mounting economic losses, plant closures or winding up of a business." Defendant's Post–Trial Brief at 10. This is simply not the law. ERISA was intended to prevent employers from making employment decisions based upon their desire to avoid pension liability. *West,* at 245. Whether the defendant's motive is cost-saving or ill-will toward a particular employee, the employer will violate ERISA if it makes an employment decision solely, or even substantially, for the purpose of avoiding pension liability. Pensions cost money; money and "economic losses" are essentially synonymous. Allowing an employer to defend an ERISA claim solely on the ground that its pension program was too expensive to maintain would defeat the purpose of § 510, which is to prohibit employers from making employment decisions based upon pension costs.

**9.** Defendant employed up to one hundred (100) temporary employees at the Asheville plant. These positions could have been made available to plaintiffs. There was no evidence that Clark was financially unable to fill these positions with permanent employees. In fact, Robert Johnson, employee relations manager at Asheville, testified that Clark hired temporary employees in part to keep the positions open for full-time workers and that Clark did not have enough transferees to fill those slots for at least one year after Benton Harbor closed.

■ In *Gavalik v. Continental Can Co.,* 812 F.2d 834 (3rd Cir.1987), the employer argued that its decision to lay-off or terminate soon-to-retire employees was based upon "economic considerations" including sales losses and increased costs. The Third Circuit rejected that argument, noting that, "section 510's essential purpose is to prevent employers from intentionally interfering with impending pension eligibility whether motivated by malice toward the particular employees or by a general concern for the economic stability of the company ... Bad faith ... is not an element of a a section 510 claim." *Id.* at 857 note 39.

■ This Court agrees with the reasoning in *Gavalik.* Had plaintiffs been able to prove that the increased cost associated with operating the Benton Harbor plant was attributable solely, or in large part, to the cost of its pension plan, the Court would have no choice but to find in favor of the plaintiffs.

■ Certainly, as defendant points out, plaintiffs must establish that Clark acted with the purpose of interfering with their attainment of benefits under the plan. Plaintiffs may not prevail if the loss of benefits was "a mere consequence of, but not a motivating factor behind a termination of employment." *Baker v. Kaiser Aluminum and Chemical Corp.,* 608 F.Supp. 1315, 1319 (N.D.Cal.1984). Plaintiffs must show "more than ... that the termination of [their] employment 'meant a monetary savings to defendants,' for otherwise an ERISA violation would automatically occur everytime an employer terminated a fulled-vested employee...." *Donohue v. Custom Management Corp.,* 634 F.Supp. 1190, 1197 (W.D.Pa.1986). The "something more" referred to in *Donohue* is the requisite causal link between pension benefits and an adverse employment action. *See Gavalik* at 859. Plaintiffs must prove by a preponderance of the evidence that the defendant's desire to avoid pension liability was a determining factor in motivating the challenged conduct. If plaintiffs establish that they lost work because of their pension benefits, plaintiffs will prevail. *Id.*

■ *Baker* and *Donohue* do not increase the plaintiffs' burden of proof, they merely restate it. They require nothing more than that the plaintiffs demonstrate that their discharges were caused by Clark's impermissible consideration of their rights under the pension plan. *Gavalik* at 859. If Clark had made the decision based primarily on the costs of the pension plan, Clark would have acted with the purpose of interfering with plaintiffs' rights under that plan. The resulting loss of benefits would not have been an "incidental" result of the decision to terminate plaintiffs' employment, it would have been the motivating factor behind that decision, the cause of their termination. *Gavalik* at 860. The difficulty for plaintiffs in this case is that Clark's witnesses testified that pension costs were one of many considerations in their decision, and that no single factor standing alone motivated or dominated their decision to close the Benton Harbor plant. Combined with the documentary evidence provided by the defendant, this testimony establishes that the decision to close the Benton Harbor plant was not motivated, or caused, by Clark's consideration of pension costs at that plant.

The defendant next argues that "the 'invidious intent' to interfere with participants' ERISA rights is not found where termination cuts along independently established lines.... Section 510 addresses discriminatory conduct directed against individuals, not actions involving a plan in general such as the winding up of a plant or division." For support, defendant turns to *Aronson v. Servus Rubber, Division of Chromalloy,* 730 F.2d 12, 16 (1st Cir.1984). *Aronson,* however, is distinguishable from this case.

In *Aronson,* the defendant-employer sold a plant, laid off its employees and terminated its pension plan entirely with respect to those employees. In that case there was no evidence that the initial decision to terminate plaintiffs' employment was based upon pension costs. The only evidence was that certain employees lost their benefits

after termination, while those who remained employed did not. The plaintiffs in *Aronson* argued that partial termination of the pension plan itself, affecting only one category of employees, was unlawful discrimination under ERISA. The First Circuit rejected this argument, finding that section 510 does not provide a remedy for employer actions involving a pension plan in general, as opposed to actions affecting specific individuals.

Here the plaintiffs argue that they, as individuals, were discriminated against because Clark chose to close the Benton Harbor plant in order to avoid pension liabilities associated with that plant. Unlike the plaintiffs in *Aronson*, they do not challenge any action taken by Clark with respect to the pension plan itself, they challenge Clark's actions with respect to their employment. *Aronson* is inapplicable to this case because *Aronson* does not discuss the propriety of terminating employment in order to avoid pension liabiltiy. Rather, *Aronson* discusses the propriety of an employer's decision to terminate a pension plan after it terminated the employees covered by that plan.

■ Taken to its logical extension, defendant's argument essentially means that an employer violates ERISA only when the employer discharges or otherwise discriminates against a single employee, rather than a class or group of employees. Again, Clark misstates the law. Class-based discrimination, whether based on race, sex or, under ERISA, pension rights, is every bit as illegal as individualized discrimination. As the court noted in *Gavalik*, "Bad faith ... is not an element of a section 510 claim." 812 F.2d at 857 note 39. *Gavalik* itself was a class action suit involving hundreds of employees who were singled out for lay-offs and other adverse employment actions not because they were disliked, but because they were close to retirement. The court found liability because these individuals proved that their employer singled them out for lay-offs and terminations based upon their seniority and

the employer's desire to reduce or eliminate its pension liabilities.

■ As *Gavalik* indicates, ERISA does not distinguish between the termination of one employee and the termination of 100 employees. Either action is illegal if taken with the purpose of avoiding pension liability. Rather, ERISA distinguishes between the intent to interfere with vested pension rights and the intent to terminate employment for other, nondiscriminatory reasons. *Gavalik* at 851; *see also, Titsch v. Reliance Group, Inc.*, 548 F.Supp. 983, 985 (S.D.N.Y.1982). While termination of employees in order to reduce labor costs is not always illegal, ERISA prohibits such actions if the primary reason for high labor costs is pension liability.

■ Defendant's final argument is that ERISA does not provide a remedy for employees whose pension rights have vested and whose only injury is the "lost opportunity to accrue additional benefits." Defendant's Post Trial Brief at 11. While Clark correctly points out that some courts have denied ERISA claims where the plaintiff's rights under a pension plan have vested, *see, Corum v. Farm Credit Services*, 628 F.Supp. 707, 717 (D.Minn.1986); *Moehle v. NL Industries, Inc.*, 646 F.Supp. 769, 779 note 6 (E.D.Mo.1986); *Baker v. Kaiser Aluminum and Chemical Corp.*, 608 F.Supp. 1315 (N.D.Cal.1984), other courts have held that the question of whether an employee's rights were vested is irrelevant to the § 510 cause of action. *Garry v. TRW, Inc.*, 603 F.Supp. 157, 162 (N.D.Ohio 1985); *Folz v. Marriott Corp.*, 594 F.Supp. 1007, 1014 (W.D.Mo.1984) (holding a discharge for the purpose of preventing continued participation in a plan for which plaintiff was already qualified violates ERISA); *Calhoun v. Falstaff Brewing Corp.*, 478 F.Supp. 357, 360 (E.D. Mo.1979).

As the *Garry* court noted, "section 510 does not preclude an employee from pursuing such a claim simply because his benefits have vested." 603 F.Supp. at 162.[10]

---

**10.** The Court notes that defendants conveniently failed to cite this Court to *Garry,* the one case

from a court in the Sixth Circuit, which addresses this issue.

While the Sixth Circuit noted, in *West v. Butler*, 621 F.2d at 245, that section 510 was "aimed primarily at preventing unscrupulous employers from discharging ... employees in order to keep them from obtaining vested pension rights," this statement does not preclude vested employees from obtaining relief under section 510. First, the Sixth Circuit used the qualifying word "primarily," leaving open the possibility that ERISA prevents more than one type of discrimination. Second, the Sixth Circuit used the phrase "*obtaining* vested pension rights." *Id.* (emphasis added) This could mean, as defendant argues, that § 510 protects only against actions taken prior to the point at which an employee's right becomes unforfeitable under ERISA. *See* 29 U.S.C. § 1053. It could just as easily mean, and this Court finds that it does mean, that § 510 protects against any discriminatory action taken to prevent an employee from obtaining (i.e., receiving) a right (i.e., benefit) to which that employee is entitled under an ERISA plan.

Finally, defendant's position is unsupported by ERISA's legislative history. As the Seventh Circuit noted in *Kross v. Western Electric Co., Inc.*, 701 F.2d 1238, 1242–43 (7th Cir.1983), "there is no evidence that Congress intended ERISA to afford less protection to senior employees than that enjoyed by ... junior employees who have not qualified for coverage under particular employee benefit plans."

Indeed, section 510 would make little sense if given the interpretation defendant urges. Employees whose pensions have vested, but whose right to retire has not yet accrued, often rely more heavily upon the promise of an adequate pension than do their younger, unvested colleagues. Older employees, like the plaintiffs in this case, are virtually unemployable if they lose their current jobs and, even if they could find work, would have a shorter working life in which to accrue new retirement benefits.[11] Younger, unvested employees can find new work more easily than older displaced workers. They have a better chance of working long enough to earn a pension simply because they are younger and have a longer working life in which to accrue these rights. Employers also have a greater incentive to discriminate against older, vested employees since these employees are closer to retirement and the employer is closer to having to pay out the benefits it has promised. The employer can make good its promises to younger employees by investing smaller amounts of money over a longer period of time, thus reducing the strain of pension benefits on employers and reducing the incentive to discriminate against younger employees. For these reasons, section 510 would be essentially unnecessary were it intended to protect only unvested employees. Not only are unvested employees in less need of protection, but employers generally lack incentives to discriminate against them. Vested employees, on the other hand, are often in greater need of the statute's protection and the employer's incentive to violate it is often greatest with respect to those employees.

■ Even if ERISA is designed primarily to protect unvested employees, the plaintiffs in this case would still have a cause of action. While their rights to early retirement benefits had vested, and they could not be denied benefits entirely, their rights to full retirement benefits had not yet accrued. Under the pension plan at issue here, plaintiffs would have to accrue thirty (30) years of service or eighty-five (85) points to obtain full retirement benefits. None of the plaintiffs met those criteria. Thus, they were "unvested" to the extent that they did not qualify for full retirement benefits. Contrary to defendant's argument, this Court can, and does, distinguish between vesting for early retirement benefits and vesting for full benefits. *Garry* at 162.

---

11. *See generally,* Report of the Secretary of Labor to Congress, The Older American Worker: Age Discrimination in Employment 11–17 (1965), reprinted in EEOC, Legislative History of the Age Discrimination in Employment Act, at 16, 28–34 (1981); National Commission for Employment Policy, 9th Annual Report, Rep. No. 17, Older Workers: Prospects, Problems and Policies 4 (1985).

ERISA protects against employer action taken to prevent the accrual of additional rights or benefits under a qualified plan. In *Garry v. TRW, Inc.,* 603 F.Supp. 157 (N.D.Ohio 1985) the Court considered just such a case and found that, "Section 510 requires this Court to consider and resolve whether [the plaintiff] was terminated for the purpose of interfering with his pension rights and preventing him from collecting increased benefits." *Id.* at 162. Similarly, in *Folz v. Marriott Corp.,* 594 F.Supp. 1007 (W.D.Mo.1984) the court found liability under § 510 where an employer discharged an employee suffering from multiple sclerosis for the purpose of preventing him from using the employer's health insurance benefits. In that case, the court held, "The allegation that an employee was terminated from his employment for the purpose of depriving him of *continued participation* in the employer's ... insurance program states a cognizable claim under section 510 of ERISA." *Id.* at 1014 (emphasis added).

In this case, plaintiffs make a similar claim. They argue that Clark terminated their employment in order to prevent them from accruing additional years of service and from obtaining full retirement benefits. This is exactly the sort of claim ERISA was intended to redress, as *Garry* and *Folz* indicate. If Clark terminated the plaintiffs' employment in order to prevent them from obtaining additional benefits under the pension plan, Clark violated ERISA. *Kross,* 701 F.2d at 1242 (rejecting the "novel theory" that once an employee has qualified for participation in a benefit plan, he can attain no increased right under that plan through additional years of employment).

While the Court views defendant's legal arguments with some distaste, it must agree with defendant's interpretation of the evidence in this case. The defendant has shown that it had a legitimate, non-discriminatory reason for terminating the plaintiffs' employment. Each Clark witness testified that he made the decision to recommend closure of the Benton Harbor plant based on a review of all the financial data available. No single item of cost or consideration was given more weight than any other. Direct testimony from at least three witnesses (James Reinhart, Raymond Pirrone and Charles Kiorpes) established that pension benefits were not a significant consideration in the decision.

The defendant's documentary evidence also shows that pension costs were not singled out, in the final analysis, as one of the factors requiring the closing of Benton Harbor. The plant capacity study, in all its various drafts, does not even contain a separate line item for pension costs. Rather, pension costs are lumped together with all fringe benefits in each version of the study. *See* Defendant's Exhibit K, MM. Finally, although Clark requested information on pension costs from its actuary firm, a unique request in the company's long history, that information was obtained, and according to Mr. Pirrone, used early on in the study in order to determine the costs of all fringe benefits. The information was included in the final study, but so was every other item of cost associated with doing business in both Benton Harbor and Asheville.

Plaintiffs' highest credible estimation of the significance of pension benefits was slightly less than 40% of the difference in labor costs between Benton Harbor and Asheville. Plaintiffs' Exhibit 67. At most, pension costs amounted to 20% of the total difference in cost between the two plants. Although this is a substantial amount, the Court finds that Clark would have made the decision to close Benton Harbor even if it had ignored the cost of the pension plan altogether. Had Clark eliminated consideration of all pension costs, there would still have been a $19.9 million difference in cost between Benton Harbor and Asheville. Even after adjusting these figures for the union's cost-cutting proposals, a difference in cost of $7.44 per standard hour exists, amounting to a difference of approximately $77,376.00 per employee over five years. These figures, together with the testimony of Clark executives, show that while Clark considered the cost of current pension benefits, and that this cost was substantial, it

did not make the difference in Clark's decision to close the Benton Harbor plant.

Clark also successfully rebutted the inference of discrimination arising from its transfer policies. Michael Hanesworth, Clark's General Counsel for Labor Relations, testified that he recommended a restrictive interpretation of the Benton Harbor employees' transfer rights in order to protect both the seniority and the pension rights of workers at the Asheville plant. As a fiduciary for the Asheville workers' pension plan, Hanesworth had to consider the effect of transfers on the financial viability of the Asheville plant's pension plan. As he noted, if large numbers of Benton Harbor employees transferred to Asheville, they would place a great deal of strain on the Asheville pension plan. Since that plan was funded with the assumption that few, if any, employees would collect benefits from it for at least ten years (see, testimony of Larry Gabriel) the plan would have been imperiled by the unanticipated retirement of workers before that date.

While the Court hesitates to explain a jury verdict, it notes that this result is not inconsistent with the jury verdict on plaintiffs' age discrimination claim. The jury could have found, as plaintiffs argued, that a great number of cost factors at Benton Harbor were dependent upon the seniority, and thus the age, of the Benton Harbor workforce.[12] These factors include all fringe benefits (including, but not limited to pensions) and all wages. In short, the age of the Benton Harbor workforce was a significant factor in determining the cost of maintaining that workforce. If one eliminates all direct labor costs from the operating cost comparison, on the theory that direct labor costs are a function of the age of the workforce, the difference between Benton Harbor and Asheville virtually evaporates. According to defendant's study, by eliminating Benton Harbor, direct labor costs would be $72.8 million. If

Asheville was eliminated, direct labor costs would have been $99.3 million. If these costs had been eliminated completely from the study, Clark's operating expenses, after eliminating Benton Harbor, would have been $77.1 million. Its operating expenses, after eliminating Asheville, would have been $77.5 million, a difference of only $400,000.00. Assuming the jury made a similar calculation (although, of course, no one knows what the jury considered) it could have found that all of the age-related factors, taken together, made the difference in Clark's decision to close Benton Harbor.

This Court cannot paint with so broad a brush, however, because the only issue before it is plaintiffs' ERISA claim. That claim concerns only the cost of the pension plan and its influence on Clark's decision. After reviewing the evidence, the Court finds that Clark sustained its burden of proving an alternative, non-discriminatory reason for its action. Clark would have made the same decision, even if it had factored pension benefits out of the study entirely, because the evidence showed that Clark was looking for the least costly alternative. *See,* Testimony of James Reinhart. Pension costs made up only 20% of the cost difference between Benton Harbor and Asheville. While that is not an insubstantial percentage, there was still a $19.9 million dollar advantage to closing the Benton Harbor plant, excluding the cost of pension benefits altogether.

Plaintiffs presented no evidence in rebuttal of Clark's asserted justification, nor does the evidence presented in their case-in-chief support the allegation that Clark's articulated reason behind closing the Benton Harbor plant was a pretext or was unworthy of belief. *Ferguson v. Freedom Forge Corp.,* 604 F.Supp. 1157 (W.D.Pa. 1985). Thus the Court concludes, some-

---

12. There is support in recent case law for finding that the savings in direct labor costs attributable to replacing an older workforce with younger, lower-salaried employees do not constitute a permissable, non-discriminatry justification for the action. *See, e.g. Metz v. Transmit*

*Mix Inc.,* 828 F.2d 1202 (7th Cir.1987); *Leftwich v. Harris–Stowe State College,* 702 F.2d 686, 691 (8th Cir.1983); *EEOC v. Chrysler Corp.,* 733 F.2d 1183 (6th Cir.1984); *Geller v. Markham,* 635 F.2d 1027 (2d Cir.1980), cert. denied, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981).

what reluctantly, that defendants should prevail on the ERISA claim.[13]

Accordingly, this Court will enter judgment in favor of defendant and against plaintiffs on this portion of plaintiffs' claim. However, inasmuch as the Court bifurcated liability from damages, and the damage claims have not yet been adjudicated, the Court will not enter a final judgment until the plaintiffs' complaint has been finally resolved.

13. Plaintiffs' complaint was never formally amended to allege the ERISA cause of action as a separate claim, thus, the Court must use this somewhat causal language in its ruling on that claim, rather than referring the parties to a specific count in the plaintiffs' complaint.