905 F.2d 1124
 Jesse DEEMING, Jr.; James N. Corman; Ivis Caudill; Boyce
Kitchens; Loren K. Burns and Norman N. Coffey,
Plaintiffs-Appellees, Cross-Appellants,
v.
AMERICAN STANDARD, INC. and Pension Board of American
Standard, Inc., Defendants-Appellants, Cross-Appellees.
 Nos. 88-3049, 88-3130.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 27, 1989.
Decided June 29, 1990.
 
 Richard J. Swanson, Segal & Macey, Indianapolis, Ind., James B. Robinson, Kircher & Phalen, Cincinnati, Ohio, Daniel McIntyre, William T. Payne, Pittsburgh, Pa., for plaintiffs-appellees, cross-appellants.
 Paula M. Taylor, Michael R. Conner, Barnes & Thornburg, Indianapolis, Ind., Roy G. Davis, Keck, Mahin & Cate, Peoria, Ill., for defendants-appellants, cross-appellees.
 Before CUMMINGS, CUDAHY and FLAUM, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 Several former employees of American Standard, Inc. who lost their jobs in a plant shutdown brought suit against their former employer and its pension board, alleging that the company had illegally interfered with their right to "creep" into a special retirement pension in violation of Sec. 510 of the Employee Retirement Income Security Act ("ERISA"). The employees also brought suit for various violations of the applicable collective bargaining agreement and for breach of fiduciary duty in connection with the loss of their pension benefits.
 
 
 2
 The case was tried to the district court, which found in favor of the employees on their ERISA claim, and granted them an additional year of "creep" service credit. The district court ruled against the employees' remaining claims. American Standard appeals the district court's ERISA ruling on the grounds that a plant closing which treats all employees the same does not involve discrimination in violation of ERISA. The employees have cross-appealed. We affirm.
 
 I. Facts
 
 3
 The appellees were all employed at a plant owned and operated by American Standard in Indianapolis, Indiana.[1] The collective bargaining agreement in force at the Indianapolis plant was set to expire on January 15, 1983. Hence, the parties began to negotiate a new collective bargaining agreement in late 1982. At that time, American Standard told the union that it was considering closing the Indianapolis plant. Approximately one week later, American Standard informed the union that the plant would be closed.
 
 
 4
 Numerous attempts at negotiation were made by the parties following this announcement, most of which centered upon American Standard's proposal to eliminate the "creep" provision in the collective bargaining agreement. The term "creep" refers to the right to acquire further age and service credit for pension purposes without doing further work. In the event of a plant shutdown, the collective bargaining agreement provided that an employee could use the "creep" provision to receive up to 24 months of additional service credit or seniority status by electing to be placed on layoff instead of receiving severance pay. (American Standard's Pension Plan contained an independent "creep" provision which allowed for only 12 months of additional service credit.)
 
 
 5
 Originally, American Standard intended to eliminate the 2-year "creep" option as of the date an employee was terminated. Later, the company offered to eliminate the employees' right to "creep" under the collective bargaining agreement as of the day the Indianapolis plant closed, June 30, 1983. The employees' union would not agree to this. A bargaining impasse was reached and American Standard unilaterally implemented its final offer. This final offer eliminated the employees' option to elect layoff in the event of termination as of the day the Indianapolis plant shut down. All of the employees at the Indianapolis plant were officially terminated as of that date.
 
 
 6
 None of the employees met the requirements for a special retirement pension when the plant closed on June 30, 1983. Hence, the appellees base their claim for special retirement benefits on their ability to "creep" past the date of their termination. The ERISA issue thus presented by this case is whether American Standard's decision to officially terminate the employees coupled with its refusal to let the employees "creep" past the day the Indianapolis plant shut down violated certain ERISA anti-discrimination provisions. These provisions prohibit discrimination designed to interfere with the attainment by employees of their pension rights. If there has been such discrimination, American Standard has violated ERISA and the appellees are entitled to the pension benefits wrongfully withheld from them.
 
 
 7
 The district court found that American Standard intentionally interfered with the employees' "creep" benefits in violation of Sec. 510 of ERISA because the company chose to allow some employees to elect layoff status while deciding to terminate others (thereby contradicting the company's own contention that "discharge" always followed a plant closing). An additional reason for the district court's finding was that the company's announced position throughout the collective bargaining negotiations had been that it was eliminating the 2-year "creep" provision because it was concerned that the future cost of the special retirement pensions could reach approximately one million dollars. The district court awarded an additional year of service credit under American Standard's Pension Plan to compensate the appellees for the company's actions. American Standard has appealed. The employees have cross-appealed from the district court's decision not to grant them the full 24 months of service credit. The employees claim that the elimination of the 2-year "creep" provision was discriminatory or, alternatively, that principles of equity require that the 2-year provision be enforced.
 
 II. ERISA Analysis
 
 8
 The elimination of pension benefits from a collective bargaining agreement to save money does not, in and of itself, constitute a violation of Sec. 510 of ERISA, 29 U.S.C. Sec. 1140. This provision states that:
 
 
 9
 It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.
 
 
 10
 The exact parameters of Sec. 510 have yet to be judicially established. It is clear from the text of the statute, however, that Sec. 510 was designed to protect the employment relationship against actions designed to interfere with, or discriminate against, the attainment of a pension right. The language of the provision speaks specifically to discharge, fine, expulsion, suspension or discrimination. Presumably, an employer may not, for example, make working conditions so unbearable that an employee is forced to quit soon before his pension rights would, in normal course, vest. Simply put, Sec. 510 was designed to protect the employment relationship which gives rise to an individual's pension rights. West v. Butler, 621 F.2d 240, 245 (6th Cir.1980).[2] This means that a fundamental prerequisite to a Sec. 510 action is an allegation that the employer-employee relationship, and not merely the pension plan, was changed in some discriminatory or wrongful way. Aronson v. Servus Rubber, Div. of Chromalloy, 730 F.2d 12, 16 (1st Cir.1984); UAW v. Park-Ohio Industries, Inc., 661 F.Supp. 1281, 1304 (N.D.Ohio 1987).
 
 
 11
 Viewed from this perspective, it becomes apparent that the mere elimination of the 2-year "creep" provision does not support a Sec. 510 claim. The appellees cannot credibly claim that the Indianapolis plant was closed primarily because American Standard wanted to save pension costs. Much of the evidence proffered at trial tends to show that American Standard's decision to close the Indianapolis plant was based on increasing foreign competition and decreasing demand for the heavy equipment manufactured at the plant. See, e.g., Trial Transcript, Volume I at 108 (Testimony of Raymond Kizzee, Jr., Union Staff Representative); Trial Transcript, Volume II at 40-41 (Testimony of Gary E. Aubry, American Standard's Manager of Employee and Labor Relations).
 
 
 12
 Instead, this branch of the appellees' argument amounts to an allegation that the 2-year "creep" provision in the collective bargaining agreement was eliminated in order to prevent the employees from obtaining special retirement benefits. To say that the 2-year "creep" provision was eliminated in order to prevent the appellees from obtaining the benefits of the 2-year "creep" provision is a tautology which highlights the fact that this sort of allegation cannot support a Sec. 510 claim. As the First Circuit noted in Aronson, Sec. 510.
 
 
 13
 relates to discriminatory conduct directed against individuals, not to actions involving the plan in general.... An overly literal interpretation of [Sec. 510] would make illegal any partial termination [of the plan], since such terminations obviously interfere with the attainment of benefits by the terminated group, and, indeed, are expressly intended so to interfere. Such cannot be the intent of the section, where the statute expressly recognizes partial terminations. See 29 U.S.C. Sec. 1343(b)(4) (incorporating Tax Code definitions, 26 U.S.C. Sec. 411(d)(3)).
 
 
 14
 730 F.2d at 16.
 
 
 15
 The appellees argue, in response, that this interpretation of Sec. 510 is unduly restrictive and that the provision is not limited to discrimination committed in the context of discharge. They contend that amending a plan to prevent the attainment of a pension right amounts to discrimination within the meaning of Sec. 510. We disagree. We are mindful that Sec. 510 of ERISA is a remedial provision which is to be liberally construed. Kross v. Western Electric Co., Inc., 701 F.2d 1238, 1242 (7th Cir.1983). In addition, we understand the loss to employees which is involved here. We cannot, however, contradict the plain language of the statute. Nor can we do violence to a statutory scheme which, on the one hand, sets forth separate provisions for the protection of the employment relationship (Sec. 510), and, on the other hand, provides, for example, for protection against discriminatory modifications of pension plans (Sec. 204(G)). Section 510 of ERISA is simply not the appropriate vehicle for redressing the unilateral elimination of severance benefits accomplished independently of employee termination or harassment.
 
 
 16
 The district court held, however, that discharge or termination did not have to follow the closing of the Indianapolis plant. In fact, the Pension Plan and the Pension Agreement both contained a provision allowing layoff as an option for employees affected by a permanent plant shutdown. This provision obviously meant that firing did not always have to follow a plant closing. Conclusion of Law No. 8. Since the employees had not been allowed to elect layoff status (as contemplated by the unmodified Pension Plan in the event of a plant shutdown) but had instead all been "terminated" after the plant ceased operations, the district court concluded that the employees' "employment relationship" had been discriminated against within the meaning of Sec. 510. We concur in the district court's conclusion. In addition, we think that the equities here strongly support a construction of Sec. 510 of ERISA which would preclude American Standard's decision to eliminate long-promised pension benefits.
 
 
 17
 This circuit has recently held that an employer may unilaterally amend or eliminate a severance plan without violating ERISA. Young v. Standard Oil (Indiana), 849 F.2d 1039, 1045 (7th Cir.1988). This holding is, however, not dispositive of the case before us. While American Standard might have been able to eliminate prospective severance benefits provided in a collective bargaining agreement unilaterally, the question remains whether the "creep" provision in the Pension Plan (which, unlike the collective bargaining agreement, had not been modified by American Standard) actually functioned as a reward for past employment, the denial of which affected the appellees' employment status.
 
 
 18
 The 2-year "creep" provision had been a part of the collective bargaining agreement since at least the 1970s. Trial Transcript, Volume I at 88 (Testimony of Raymond E. Kizzee, Jr., Union Staff Representative). We assume that the same was true, in some form, of the "creep" provision in the Pension Plan. This means that the appellees had been relying on these "creep" benefits for some time since we presume reliance from continued employment. In addition, the language of the "creep" provision contained in the Pension Plan is open ended. ("Any employee ... whose service is broken on or after January 16, 1980, by reason of a permanent shutdown of a plant.... shall be eligible to retire on or after January 16, 1980 and receive a pension.") Moreover, the provision clearly applies to cases of plant shutdown. All of these factors dictate the conclusion that to allow American Standard to eliminate the "creep" benefit in the Pension Plan just as the Indianapolis plant was closing after long years of reliance by the appellees, "would run counter to ... fundamental principles of equity and justice." Kulins v. Malco, A Microdot Co., Inc., 121 Ill.App.3d 520, 76 Ill.Dec. 903, 910, 459 N.E.2d 1038, 1045 (1984). We therefore hold that the termination of an employee who has been promised the ability to determine his own employment status upon the shutdown of a plant amounts to discrimination against the "employment relationship" that Sec. 510 was designed to protect.
 
 
 19
 The appellees have waived on appeal the other claims contained in their complaint and addressed by the district court. Sere v. Bd. of Trustees, 852 F.2d 285, 290 (7th Cir.1988); Sanchez v. Miller, 792 F.2d 694, 703 (7th Cir.1986), cert. denied, 479 U.S. 1056, 107 S.Ct. 933, 93 L.Ed.2d 984 (1987). Hence, they do not require discussion here.
 
 III. Conclusion
 
 20
 The judgment of the district court granting the appellees an additional year of service credit under American Standard's Pension Plan as a remedy for American Standard's Sec. 510 violation is affirmed. Because the appellees have waived their remaining claims, the judgment of the district court in all other respects is
 
 
 21
 AFFIRMED.
 
 
 
 [1]
 All of the employees are participants in the pension plan sponsored by American Standard. The Pension Board of American Standard administrates the plan
 
 
 [2]
 As the Ninth Circuit noted in Lojek v. Thomas, 716 F.2d 675, 680-681 (9th Cir.1983),
 "ERISA's legislative history ... reveals that Congress was concerned with the acts of unscrupulous employers who discharged and harassed their employees in order to keep them from obtaining vested pension rights. Senator Hartke, speaking in support of [Sec. 510] sanctions for interference with protected rights, made it clear:
 Most collective bargaining agreements protect employees against discharge without good cause and provide effective enforcement machinery in arbitration proceedings whose results are enforceable under section 301 of the Labor-Management Relations Act. But roughly half of all pension participants are not unionized and so they lack protection. Especially vulnerable are managers and executives whose substantial pension potentialities provide an incentive to their discharge before vesting."
 (footnote omitted). See also S.Rep. 93-127, at 35-36, 1 ERISA Leg. Hist. 621-622, 2 ERISA Leg. Hist. 1641 and 1811, and 3 ERISA Leg. Hist. 4753 (statements of Senator Javits on the legislative purpose behind Sec. 510); 3 ERISA Leg. Hist. 4745 (statement of Senator Williams); 2 ERISA Leg. Hist. 3491 (statement of Representative Wright).